In re Gregory A. LeMAIRE, Debtor.

Paul HANDEEN, Appellant,

v.

Gregory A. LeMAIRE, Appellee.

No. 88–5275.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 10, 1989.
Decided March 26, 1990.

Richard G. Nadler, St. Paul, Minn., for appellant.

Richard K. Brainerd, Richfield, Minn., for appellee.

Before LAY, Chief Judge, and McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL and BEAM, Circuit Judges, En Banc.

JOHN R. GIBSON, Circuit Judge.

The issue before us is whether a civil judgment awarded to the victim of an intentional shooting may be discharged under Chapter 13 of the Bankruptcy Act, 11 U.S.C. §§ 1301–1330 (1988). Paul Handeen, the victim of the assault and subsequently a judgment creditor, asks this court to hold, as a matter of law, that the judgment arising out of criminal conduct may not be discharged. Alternatively, he argues that the bankruptcy court's holding that the debtor Gregory LeMaire proposed his Chapter 13 plan in good faith was clearly erroneous. We conclude that the court's finding of good faith was clearly erroneous and therefore reverse and remand for further proceedings consistent with this opinion.

On July 9, 1978, at about noon, Handeen went to pick up his son and found LeMaire waiting for him. When Handeen got out of his car, LeMaire shot at him nine times with a bolt action rifle. The first two shots missed Handeen, but the third struck him on the left side of his neck. Handeen then attempted to hide behind the car. LeMaire circled the car, shot at and missed Handeen twice more, and then hit him inside of his left knee. LeMaire circled again and Handeen jerked his head back to avoid the bullet at the time he thought LeMaire would pull the trigger of the rifle aimed at his head. LeMaire fired, and the bullet went through Handeen's right nostril, shattering the roof of his mouth and going through his tongue. LeMaire then fired a shot at Handeen's left arm. The bullet went through Handeen's arm and lodged on his spine. LeMaire fired a final shot through Handeen's ankle. In all, five of the nine shots fired by LeMaire struck Handeen. LeMaire declared that he had intended to kill Handeen. (Tr. Bankr.D. Minn. Oct. 28, 1987, at 23, 35–38). He pled guilty to a charge of aggravated assault and was sentenced to imprisonment for a term of one to ten years. He served twenty-seven months of his sentence and was released in 1981. LeMaire then returned to graduate school at the University of Minnesota and received his doctorate in experimental behavioral pharmacology in January 1986.

Handeen brought a civil suit against LeMaire and obtained a consent judgment. LeMaire paid $3,000 of the judgment, but made no further payments, prompting Handeen to commence garnishment proceedings to collect the $50,362.50 balance on the judgment. Soon after, on January 16, 1987, LeMaire filed this bankruptcy petition under Chapter 13.

Handeen objected to the bankruptcy court confirming LeMaire's Chapter 13 plan; the bankruptcy court, however, rejected his assertion that the civil judgment arising out of the crime was not dischargeable. The court instead confirmed LeMaire's plan, which provided that his creditors be paid approximately 42% on their claims. The plan listed three claims: (1) Handeen's judgment; (2) a student loan; and (3) a claim by LeMaire's parents for loans to LeMaire, including $3,600 expended on his legal fees, $3,000 spent in partial payment on the judgment, and $2,172 lent to buy a computer. The record reveals that LeMaire's debt to his parents was evidenced by a promissory note he signed the day before he filed his Chapter 13 petition.

Handeen appealed to the district court from the bankruptcy court's order confirming LeMaire's Chapter 13 plan. The district court affirmed and, upon appeal, a

panel of this court also affirmed. *In re LeMaire*, 883 F.2d 1373 (8th Cir.1989). We granted rehearing en banc, vacated the panel opinion, and heard oral argument. We now reverse.

### I.

Handeen vigorously argues that, as a matter of law, his civil judgment cannot be discharged because it arose from a criminal act. The panel rejected this argument and we do likewise.

■ Handeen's argument is based upon 11 U.S.C. § 523(a)(6) (1988),[1] which provides that a debt arising from infliction of "willful and malicious injury by the debtor to another entity" may not be discharged under specified sections of the Bankruptcy Code. As the panel observed, there is no question that LeMaire's assault inflicted a "willful and malicious" injury upon Handeen. 883 F.2d at 1376. Handeen's reliance upon section 523(a)(6) is unavailing, however, because LeMaire filed his petition under Chapter 13, which does not include section 523(a)(6) in its list of nondischargeable debts. *See* 11 U.S.C. § 1328(a) (1988).[2] Although section 523(a)(6) does by its express statutory terms apply to a petition for bankruptcy under Chapter 7, its applicability does not extend to a filing under Chapter 13. Therefore, a debt which falls within the scope of section 523(a)(6), such as the debt owed to Handeen, which may not be discharged under Chapter 7, may

nevertheless be discharged if the debtor meets the requirements of Chapter 13.[3]

### II.

Alternatively, Handeen argues that the bankruptcy court should not have confirmed LeMaire's Chapter 13 plan because LeMaire did not propose it in good faith. Section 1325(a) of Title 11 of the Bankruptcy Code establishes six criteria which a debtor must meet in order to have his Chapter 13 plan confirmed by a bankruptcy court. The critical requirement, for present purposes, is that "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3) (1988).

In deciding whether LeMaire has met the good faith criterion, we recognize that legislative amendments to section 1325 have affected judicial interpretation of the phrase "good faith," which is defined neither in the Bankruptcy Code nor in its legislative history. Prior to the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984), our analysis focused upon "whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13." *In re Estus*, 695 F.2d 311, 316 (8th Cir.1982). This required looking to the totality of circumstances to discern whether good faith existed, a task aided by the *Estus* court listing a number of factors it considered relevant to this analysis.[4] This approach

---

**1.** This section of the Bankruptcy Code provides:

(a) A discharge under section 727, 1141,, [sic] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

**2.** This section provides:

(a) As soon as practicable after completion by the debtor of all payments under the plan, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt—

(1) provided for under section 1322(b)(5) of this title; or

(2) of the kind specified in section 523(a)(5) of this title.

11 U.S.C. § 1328(a).

**3.** A number of bankruptcy and district court decisions support this. *See, e.g., In re Swan*, 98 B.R. 502, 504 (Bankr.D.Neb.1989); *In re DeSimone*, 25 B.R. 728, 729 (E.D.Pa.1982); *In re Seely*, 6 B.R. 309, 311 (Bankr.E.D.Va.1980).

**4.** As enumerated by the *Estus* court, these factors include:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment

was widely used in other circuits. *See Neufeld v. Freeman,* 794 F.2d 149, 152 (4th Cir.1986); *Flygare v. Boulden,* 709 F.2d 1344, 1347 (10th Cir.1983); *In re Kitchens,* 702 F.2d 885, 888–89 (11th Cir.1983); *In re Goeb,* 675 F.2d 1386, 1390 (9th Cir.1982); *In re Rimgale,* 669 F.2d 426, 432–33 (7th Cir.1982).

After *Estus,* the Bankruptcy Amendments and Federal Judgeship Act of 1984 added a new section 1325(b) which authorizes courts to confirm a plan in which all of the debtor's disposable income for three years is applied to make payments under the plan. 11 U.S.C. § 1325(b). In *Education Assistance Corp. v. Zellner,* 827 F.2d 1222 (8th Cir.1987), we considered the effect of the new section 1325(b) on the *Estus* analysis of good faith. We stated that the new section's "ability to pay" criteria subsumed most of the *Estus* factors and thus narrowed the focus of the good faith inquiry. *Id.* at 1227. We described the narrower focus as depending upon "whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code." *Id.*

■ Although *Zellner* modified the good faith determination in response to the new section 1325(b), it is recognized that *Zellner* preserved the traditional "totality of circumstances" approach with respect to *Estus* factors not addressed by the legislative amendments. *See In re Smith,* 848 F.2d 813, 820 n. 8 (7th Cir.1988). Thus, in considering whether LeMaire proposed his plan in good faith, factors such as the type of debt sought to be discharged and whether the debt is nondischargeable in Chapter 7, and the debtor's motivation and sincerity

in seeking Chapter 13 relief are particularly relevant. *Estus,* 695 F.2d at 317. These are factual findings made by the bankruptcy court which we review under a clearly erroneous standard. "When a district court reviews a bankruptcy court's judgment, it acts as an appellate court." *Wegner v. Grunewaldt,* 821 F.2d 1317, 1320 (8th Cir.1987). In turn, when the case is appealed to this court, we perform the same appellate function as the district court of reviewing legal conclusions on a de novo basis and factual findings under a clearly erroneous standard. *Id.*

■ The Supreme Court carefully articulated the principles governing a court examining factual findings under the clearly erroneous standard in *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 573, 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). *Anderson* cautions that the clearly erroneous standard does not entitle us to reverse the trier of fact simply because we would have decided the case differently. *Id.* We are directed that we may not decide factual issues de novo, *id.,* and that when there are two permissible views of the evidence, we may not hold that the choice made by the trier of fact was clearly erroneous. *Id.* at 574, 105 S.Ct. at 1511. Moreover, where the factual findings call for an assessment of witness credibility, even greater deference to the trier of fact is demanded. *Id.* at 575, 105 S.Ct. at 1512.

of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

    (5) the extent of preferential treatment between classes of creditors;

    (6) the extent to which secured claims are modified;

    (7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

    (8) the existence of special circumstances such as inordinate medical expenses;

    (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

    (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

    (11) the burden which the plan's administration would place upon the trustee.

695 F.2d at 317.

■ Under *Anderson*, this deference also extends to the trier of fact's consideration of physical or documentary evidence. *Id.* at 574, 105 S.Ct. at 1511. This deference is not unlimited, however, and we may consider documents or objective evidence which contradict a witness' story, or take notice of the fact that the story is so internally inconsistent or facially implausible that a reasonable factfinder would not credit it. *Id.* at 575, 105 S.Ct. at 1512.

Thus, our task here is to review the bankruptcy court's factual findings under the clearly erroneous standard, as developed in *Anderson*, in order to determine whether LeMaire proposed his Chapter 13 plan in good faith. When we do so, based upon the uncontradicted record before the bankruptcy court, we are left with "the definite and firm conviction that a mistake has been committed." *Id.* at 573, 105 S.Ct. at 1511 (quoting *United States Gypsum Co.*, 333 U.S. at 395, 68 S.Ct. at 542).

In its order confirming LeMaire's plan, the bankruptcy court examined in detail each of the eleven factors enumerated by the *Estus* court to assess whether a plan has been proposed in good faith. We are particularly concerned with the court's treatment of two of these factors: [5] (1) whether the debt is nondischargeable in Chapter 7; and (2) the debtor's motivation and sincerity in seeking Chapter 13 relief. *See Estus*, 695 F.2d at 317.

### A.

■ *Estus* directs a bankruptcy court to consider whether the debt would be nondis-

chargeable in a Chapter 7 filing, and the court did so here, observing that this factor is closely linked to the debtor's motivation and sincerity. Although the court was correct in this observation, our review of the record convinces us that the court accorded insufficient weight to this factor. The specific evidence in the record which persuades us that the bankruptcy court was clearly erroneous in finding that LeMaire proposed his plan in good faith is discussed below in the context of another *Estus* factor, LeMaire's motivation and sincerity in seeking Chapter 13 relief. At this point, we need only observe that this debt could not be discharged under Chapter 7.

### B.

In evaluating LeMaire's motivation and sincerity, the bankruptcy court balanced Handeen's desire to be compensated for his injuries against LeMaire's desire to have a fresh start and found the latter to outweigh the former in importance. The court noted that, while LeMaire had been unable to pay his debt to his victim, he had paid his debt to society by serving a prison sentence and had attempted to reorder his life and make a fresh start. The court found that forcing LeMaire to be burdened the rest of his life with a judgment which would continue to accrue interest, result in endless garnishments, and prevent him from accumulating property would be inimical to such a fresh start. The court concluded that LeMaire had made a whole-

---

**5.** We are also concerned with the bankruptcy court's treatment of other *Estus* factors. Estus directs the bankruptcy court to determine the extent of preferential treatment between classes of creditors and the court here found that LeMaire's proposed plan did not discriminate among his creditors. There was evidence in the record, however, that LeMaire's petition failed to disclose a contingent debt in the amount of $30,000 to $50,000 which he would have to pay back to the United States Public Health Service if he failed to fulfill the terms of this fellowship stipend. (Tr. Bankr.D.Minn. May 20, 1987, at 10–11, 30). At the hearing, LeMaire testified freely about this debt and his understanding that it would have to be paid back if he did not satisfy the terms of his fellowship. Since LeMaire failed to include this contingent debt in

his plan, it would not be discharged after he completed payments to other creditors under the plan. *See In re Gregory*, 705 F.2d 1118, 1122 (9th Cir.1983); *In re Gamble*, 85 B.R. 150, 152 (Bankr.N.D.Ala.1988); *In re Martinez*, 51 B.R. 944, 948 (Bankr.D.Colo.1985); *In re Doane*, 19 B.R. 1007, 1009 (W.D.Va.1982). Since the debt would be accorded different treatment than LeMaire's other debts, there would be discrimination among creditors.

Another *Estus* factor, the accuracy of LeMaire's statements of debts and expenses, is also affected by this failure to disclose. The amount of this undisclosed contingent debt, $30,000 to $50,000, makes this omission quite significant. The bankruptcy court, however, found no evidence of inaccuracies.

hearted attempt to pay Handeen as much as possible, and that LeMaire's motivation was proper and his sincerity real.

We are convinced that the court's analysis here fails to properly consider the strong public policy factors, inherent in the Bankruptcy Code, which are implicated in discharging this debt and gives undue emphasis to the fact that the statutory terms governing Chapter 13 petitions do not expressly make a debt resulting from a willful and malicious injury nondischargeable. In light of the court's clear errors both in according insufficient weight to the nondischargeability of this debt in Chapter 7, and in finding that LeMaire's motivation and sincerity in seeking Chapter 13 relief were proper, we do not believe that LeMaire has fulfilled the good faith requirement of Chapter 13. We are "left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511 (quoting *United States Gypsum Co.*, 333 U.S. at 395, 68 S.Ct. at 542).

After reviewing the bankruptcy court's findings here, according due deference to its credibility determinations, we are compelled to conclude that the bankruptcy court's finding was clearly erroneous because the evidence before the court regarding LeMaire's good faith was so "implausible on its face that a reasonable factfinder would not credit it." *Id.* at 575, 105 S.Ct. at 1512. The record here very clearly indicates that LeMaire intended to kill Handeen, he shot at him nine times, he hit him with five of the bullets, and he nearly succeeded in his intention. The record also

reveals that LeMaire sought the protection of bankruptcy when Handeen tried to collect his judgment. Ironically, LeMaire listed the $3000 which he actually paid on the judgment as a debt owed to his parents, as evidenced by a promissory note signed the day before he sought bankruptcy protection.[6] The record shows that LeMaire received his doctorate from the University of Minnesota and was appointed as a postdoctoral research fellow at the University. Handeen argues that LeMaire's fellowship, which pays him a relatively low wage, is essentially a means of repaying a debt of $30,000 to $50,000 owed to the United States Public Health Service. As we have observed, this debt was not included in the plan but LeMaire testified freely that he was aware of it and of his obligation to pay it back if he failed to comply with his obligations to the Public Health Service. The bankruptcy court did not address this argument. We believe, however, that the court should have discussed whether LeMaire's failure to disclose this contingent debt when he filed his petition and his testimony of the continuing obligation demonstrated a lack of good faith and unfair manipulation of the Bankruptcy Code. The bankruptcy court's order does not specifically discuss whether LeMaire has attempted to unfairly manipulate the Bankruptcy Code, despite the fact that this inquiry has been identified as central to the court's task of determining whether the plan "constitutes an abuse of the provisions, purpose or spirit of Chapter 13." *Zellner*, 827 F.2d at 1227 (quoting *Estus*, 695 F.2d at 316).[7]

6. We are troubled by the circumstances surrounding LeMaire's obligations to his parents. The record shows that LeMaire signed a promissory note evidencing a debt to his parents of $12,722 only one day prior to filing his bankruptcy petition. Prior to this filing, LeMaire had never made any payments on his debts to his parents, even though he had incurred some of them years earlier and he was receiving a regular stipend from his fellowship. (Tr. Bankr.D.Minn. Oct. 28, 1987, at 15–16, 25). LeMaire's plan also listed as an expense a monthly rental payment of $240 to his parents. The record shows that he had never paid rent while living at home in the past. (Tr. Bankr.D.Minn. May 20, 1987, at 16).

Despite this evidence in the record, the bankruptcy court found that LeMaire's financial dealings with his parents did not indicate bad faith on his part. We need not review these findings more closely, however, because we believe that there is other evidence in the record which persuades us that the bankruptcy court's finding of good faith was clearly erroneous.

7. We do not mean to imply that the bankruptcy court should have disregarded all of the *Estus* factors and focused solely on whether LeMaire had attempted to unfairly manipulate the Bankruptcy Code. We recognize, as the *Estus* court did, that no litmus test exists for determining good faith and that "the factors and the weight they are to be given will vary with the facts and circumstances of the case." *Estus*, 695 F.2d at

■ We recognize that "a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where *other factors* suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims." *Neufeld,* 794 F.2d at 153 (emphasis added). While pre-filing conduct is not determinative of the good faith issue, it is nevertheless relevant. *See, In re Doersam,* 849 F.2d 237, 239 (6th Cir.1988); *Smith,* 848 F.2d at 818; *Neufeld,* 794 F.2d at 152. When we consider the pre-filing conduct here, including the maliciousness of the injury which LeMaire inflicted upon Handeen, in light of the lack of "other factors" sufficient to establish good faith, we are persuaded that the bankruptcy court clearly erred in finding that LeMaire proposed his plan in good faith.

Our decision does not rest solely on considerations of public policy; we believe, however, that it is appropriate to note that our decision is consistent with the policies underlying the Bankruptcy Code. "[T]he primary purpose of the bankruptcy statute ... is the collection and distribution of the debtor's estate to his creditors." *In re May,* 12 B.R. 618, 621 (N.D.Fla.1980). A secondary purpose is to discharge the debtor's financial obligations and is "designed to give the honest debtor the opportunity to reinstate himself in the business world; it is not intended to be available to a dishonest debtor." *Id.*[8] *See also In re Shapiro,* 59 B.R. 844, 847 (Bankr.E.D.N.Y. 1986) ("the discharge of debts inures to the benefit of only the honest debtor").[9]

While the bankruptcy court correctly recognized that the exceptions to discharge specified in section 523(a)(6) do not expressly apply to a Chapter 13 petition, the court's analysis falls short by failing to examine the public policies promoted by not discharging the debts enumerated there. It is valuable to compare section 523(a)(6), stating that debts resulting from willful and malicious injury may not be discharged, with the other debts which section 523 states may not be discharged. The section exempts from discharge debts for a tax or customs duty; for money obtained by false pretenses; for embezzlement or larceny; for support of a spouse, former spouse, or child; for governmental fines or penalties; and for educational loans guar-

317. We believe, however, that the facts and circumstances of this particular case merited at least some discussion of whether LeMaire had attempted to unfairly manipulate the Bankruptcy Code. The bankruptcy court simply failed to address the issue altogether.

**8.** The dissent takes issue with our consideration of policy factors in holding that LeMaire did not propose his bankruptcy plan in good faith. We believe, however, that Congress did not intend to replace the discretion of courts with a rigid, mechanistic checklist to assess good faith. We are to bear in mind that the good faith requirement is "the only safety valve available through which plans attempting to twist the law to malevolent ends may be cast out." *In re Waldron,* 785 F.2d 936, 939 (11th Cir.1986) (quoting *In re Leal,* 7 B.R. 245, 248 (Bankr.D.Colo.1980)). Thus, our task is to consider the totality of the circumstances, in light of the policies inherent in the Bankruptcy Code, to determine whether a court's finding of good faith was clearly erroneous. The Eleventh Circuit has explained the role of policy analysis in this determination:

[W]ith section 1325(a)(3) Congress intended to provide bankruptcy courts with a *discretionary means to preserve the bankruptcy process for its intended purpose.* Accordingly, whenever a Chapter 13 petition appears to be tainted with a questionable purpose, it is incumbent upon the bankruptcy courts to examine and question the debtor's motives. If the court discovers unmistakable manifestations of bad faith, as we do here, confirmation must be denied.

Unmistakable manifestations of bad faith need not be based upon a finding of actual fraud, requiring proof of malice, scienter or an intent to defraud. *We simply require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse.*

*Id.* at 941 (emphasis added).

**9.** In a case cited by both the dissent and this opinion, *In re Okoreeh–Baah,* 836 F.2d 1030 (6th Cir.1988), the Sixth Circuit explained the effect of dishonesty in the Chapter 13 context. "One way to refuse to sanction the use of the bankruptcy court to carry out a basically dishonest scheme under Chapter 13 is to deny confirmation of the proposed plan. When the debtor's conduct is dishonest, the plan simply should not be confirmed." *Id.* at 1032 (emphasis removed) (quoting *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 432 (6th Cir.1982)); *see also In re Rasmussen,* 888 F.2d 703, 705–06 (10th Cir.1989) (per curiam); *Neufeld,* 794 F.2d at 152–53.

anteed by the government. While there is a strong public policy prohibiting the discharge of each of these types of debts, we believe that there is a particularly strong policy prohibiting the discharge of a debt resulting from a willful and malicious injury following an attempted murder.

We recognize that Congress intentionally expanded the scope of the debtor's discharge in Chapter 13 after he completes his plan in order to "encourage more debtors to attempt to pay their debts under bankruptcy court supervision." *Estus*, 695 F.2d at 313. "The fact that a discharge would not be available in a [chapter 7] liquidation case should furnish a greater incentive for the debtor to perform under the [Chapter 13] plan." H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 129 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6090. But we believe that the public policies promoted by not discharging a debt resulting from willful or malicious injury in any Chapter 7 case are also implicated in this particular Chapter 13 case, and that the bankruptcy court's decision was clearly erroneous in not according these policies sufficient weight. Our decision should not be read as a broad declaration extending beyond the facts before us. We simply hold that the circumstances surrounding this particular debt reveal that Lemaire did not demonstrate the requisite good faith to seek Chapter 13 protection and that refusing to discharge this particular debt, because of his lack of good faith, is consistent with the policies which the Bankruptcy Code seeks to advance.

We recognize our obligation to evaluate the good faith determination in the totality of the circumstances, and we have reviewed the bankruptcy court's treatment of the factors enumerated in *Estus*. We also recognize, however, that the weight accorded to each factor varies with the circumstances of each case, *Estus*, 695 F.2d at 317, and, "in the final analysis, good faith should be evaluated on a case-by-case basis in light of the structure and general purpose of Chapter 13." *Doersam*, 849 F.2d at 239 (citing *Estus*, 695 F.2d at 316). There are no "precise formulae or measurements to be deployed in a mechanical good faith equation." *In re Okoreeh–Baah*, 836 F.2d 1030, 1033 (6th Cir.1988). When we consider the totality of the circumstances in light of the purposes of Chapter 13, we are compelled to conclude that the bankruptcy court's finding that LeMaire proposed his plan in good faith was clearly erroneous.

We remand this case to the district court with instructions to remand, in turn, to the bankruptcy court for further proceedings consistent with this opinion.

MAGILL, Circuit Judge, with whom LAY, Chief Judge, and McMILLIAN, Circuit Judge, join, dissenting.

I respectfully dissent. Although it purports to consider the totality of the circumstances and give due deference to the bankruptcy court's credibility determinations, the majority ultimately relies on its own view of "public policy" to hold clearly erroneous the bankruptcy court's finding that LeMaire proposed his plan in good faith. I reject the idea that this court's own policy preference is a legitimate basis for reversing the bankruptcy court's decision.

I.

Despite the disclaimer that its decision does not rest on "public policy" alone, *ante* at 1352, the majority concludes that "the public policies promoted by not discharging a debt resulting from willful or malicious injury in any Chapter 7 case are also implicated in this particular Chapter 13 case, and that the bankruptcy court's decision was clearly erroneous in not according these policies sufficient weight." *Ante* at 1353. The majority's holding is contrary to the law of this circuit, *In re Estus*, 695 F.2d 311 (8th Cir.1982), and the many other circuits which have held that good faith under 11 U.S.C. § 1325(a)(3) must be judged on the totality of the circumstances. *In re Okoreeh–Baah*, 836 F.2d 1030 (6th Cir.1988); *Public Finance Corp. v. Freeman*, 712 F.2d 219 (5th Cir.1983); *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983); *In re Kitchens*, 702 F.2d 885 (11th Cir. 1983); *Deans v. O'Donnell*, 692 F.2d 968

(4th Cir.1982); *In re Goeb,* 675 F.2d 1386 (9th Cir.1982); *In re Rimgale,* 669 F.2d 426 (7th Cir.1982); *see also In re Johnson,* 708 F.2d 865, 868 (2d Cir.1983) (implicitly approving totality of circumstances approach). 11 U.S.C. § 1328(a) expressly states that, except for alimony, child support, and certain long-term obligations, "all debts" provided for in a Chapter 13 plan "shall" be discharged after the completion of payments under the plan. Thus, "[a]lthough the debtor's motive in invoking Chapter 13 solely to obtain discharge of a[n] [otherwise] non-dischargeable debt, as well as the circumstances under which that debt arose, may be factors to consider as part of the totality of the circumstances, they cannot, as a matter of law, suffice to show bad faith." *In re Chaffin,* 816 F.2d 1070, 1074 (5th Cir.1987), *modified on reconsideration on other grounds,* 836 F.2d 215 (5th Cir.1988); *see also In re Smith,* 848 F.2d 813, 818 (7th Cir.1988) (quoting *Chaffin* ); *In re Caldwell,* 851 F.2d 852, 860 (6th Cir.1988) (agreeing with *Chaffin* ). Section 1325(a)(3) requires that the plan be " '*proposed* in good faith' ..., not that the debt was incurred in good faith." *Smith,* 848 F.2d at 819 (emphasis added in *Smith* ). As a result, " 'a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims.' " [10] *Id.* (quoting *Neufeld v. Freeman,* 794 F.2d 149, 153 (4th Cir.1986)); *In re Rasmussen,* 888 F.2d 703, 705 (10th Cir.1989) (per curiam) (same). Along with every other circuit that has addressed the issue, this circuit has held

that a Chapter 13 debtor's attempt to discharge a debt nondischargeable in Chapter 7 is not *per se* bad faith under § 1325(a)(3), but rather is simply *one* of many factors to be considered in applying the totality of the circumstances standard. *Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987); *Estus,* 695 F.2d at 317.

Despite the express terms of §§ 1328(a) and 1325(a)(3) and the overwhelming weight of the case law, Handeen argues that a Chapter 13 plan paying less than one hundred percent of a debt incurred as the result of a heinous crime can never be proposed in good faith.[11] On appeal, the district court correctly rejected this argument, as did a panel of this court. *See In re LeMaire,* 883 F.2d 1373 (8th Cir.1989).[12] Under the guise of the clearly erroneous standard, the majority now effectively applies the bright line rule urged by Handeen. It concludes that a finding of good faith is precluded in this case because of a strong "public policy" against the discharge of debts arising from crimes as heinous as that committed by LeMaire. *Ante* at 1351, 1352–1353. This position is directly contrary to the express terms of Chapter 13 and has no support in the statute's legislative history. In my view, this court is not free to declare its own notion of justice as "public policy" where Congress has clearly spoken to the contrary. I believe the bankruptcy court's finding of good faith is not clearly erroneous and therefore must be affirmed. The court conducted the requisite inquiry and its findings are certainly "plausible in light of the

---

**10.** The majority acknowledges the existence of this well-established principle, *ante* at 1352, but finds a lack of other factors indicating a good faith effort only by ignoring many of the factors underlying the bankruptcy court's decision and rejecting its treatment of others on the basis of "public policy." Because of the heinous nature of LeMaire's crime, the majority is simply unwilling in this case to recognize that "[i]t is not conclusively bad faith for a debtor to seek to discharge a debt incurred through his own criminal or tortious conduct." *In re Caldwell,* 895 F.2d 1123, 1127 (6th Cir.1990).

**11.** The majority states that Handeen makes two separate arguments, one based on 11 U.S.C.

§ 523(a)(6), and the other based on § 1325(a)(3). Actually, Handeen makes an argument that involves both sections, i.e., because § 523(a)(6) makes the debt arising out of LeMaire's heinous criminal act nondischargeable in Chapter 7, his Chapter 13 plan was not proposed in good faith under § 1325(a)(3) as a matter of law.

**12.** The panel rejected Handeen's argument for a bright line rule because "[s]uch a rule would effectively extend the nondischargeability provision of 11 U.S.C. § 523(a)(6) to Chapter 13 proceedings, a result directly contrary to Chapter 13's terms and unsupported by the statute's legislative history." 883 F.2d at 1374.

record *viewed in its entirety.*" *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (emphasis added).

The bankruptcy court carefully considered each of the relevant factors set forth in *Estus* and, in light of all the circumstances of the case, determined that LeMaire's plan was proposed in good faith. *In re LeMaire,* No. 4-87-164 (Bankr.D. Minn. Nov. 12, 1987) [hereinafter Order]. The majority ignores many of the findings underlying the bankruptcy court's determination. The court found the proposed percentage of payment (42.3 percent of each unsecured debt) was "significant." Order at 10. In addition, the plan provided for payments over a period of five years, the maximum period allowable under Chapter 13. *See* 11 U.S.C. § 1322(c). After examining the terms of the proposed plan in detail, the court was "convinced that the debtor has made substantial financial sacrifices and that his parents have made significant financial sacrifices, which they are not required to do." Order at 8. Indeed, the court found that "[t]he debtor already has excess expenses over income which will have to made up [sic] by sacrifices in other places or by continued financial support from his parents. He has already foregone such things as entertainment and budgets a minimal amount for clothing." *Id.* at 7. The court found that there had been no attempt to mislead the court and that LeMaire had not previously sought relief under the Bankruptcy Code. The plan imposed no particular administrative burden on the trustee. The court also found that LeMaire had been offered employment to commence at the end of his three-year fellowship, and specifically noted that the plan would be subject to modification under 11 U.S.C. § 1329(a) if LeMaire's income increased significantly.[13]

The bankruptcy court recognized that the debt to Handeen would be nondischargeable in Chapter 7 and that this was a factor to "weigh carefully" before confirming Lemaire's plan. Order at 12. Accord-

ingly, the court carefully took into account the dischargeability factor, along with other relevant considerations, when it evaluated LeMaire's motivation and sincerity in seeking Chapter 13 relief:

I can certainly understand Handeen's feelings; he has been grievously wronged, seriously injured, and now may receive only part of the agreed on compensation for that injury. However, it is the very essence of bankruptcy to provide a debtor with a fresh start. *The concept of fresh start is one that is very much overworked, but is one which applies in this case.* The debtor pled guilty to the crime that he committed and has paid his debt to society but, unfortunately, has not been able to pay his debt to his victim. It appears that he has made *every* attempt to reorder his life and obtain the fresh start that bankruptcy promises. Having to live the rest of his life with a significant judgment which would forever accrue interest and result in endless garnishments against his wages and keep him from accumulating any property would be inimical to such a fresh start. *I feel that he has made a wholehearted attempt to pay Handeen as much as he is able, which turns out to be a significant amount. Under these circumstances, I find that his motivation is proper and his sincerity real.*

Order at 13 (emphasis added).

The majority misreads the nature of the bankruptcy court's evaluation and, in so doing, disregards an essential basis for the court's ultimate determination with respect to LeMaire's motivation and sincerity. The majority fails to recognize that the key to the court's determination was its finding that LeMaire "has made a wholehearted attempt to pay Handeen as much as he is able." It is clear the bankruptcy court made a separate finding that LeMaire was making such an attempt, and it was this finding that in large part led the court to conclude LeMaire was entitled to have the fresh start principle, the cornerstone of

---

**13.** Under § 1329(a), LeMaire, Handeen or the trustee could request an increase in the level of

payments at any time before the completion of payments under the five-year plan.

bankruptcy law, weigh significantly in his favor. This finding obviously rests primarily on an assessment of LeMaire's credibility. As was stated in the panel opinion, "[t]he bankruptcy court, having had the benefit of several hearings and testimony from the parties, is uniquely qualified to judge the credibility of the debtor and to ascertain his motivation." 883 F.2d at 1379; *see also In re Saylors,* 869 F.2d 1434, 1438 (11th Cir.1989) (bankruptcy court is in "best position" to judge the debtor's credibility). Under the clearly erroneous standard of review, we must pay special deference to the bankruptcy court's credibility determinations. *See* Bankruptcy Rule 8013; *Bessemer City,* 470 U.S. at 574–75, 105 S.Ct. at 1511–12. In *Zellner,* 827 F.2d at 1227, we affirmed a finding of good faith because "the bankruptcy court was convinced that the plan is a serious attempt to repay the student loans" (debts nondischargeable in Chapter 7), and not an abuse of the bankruptcy laws. The bankruptcy court here was similarly convinced after utilizing the "fact-finding expertise" we recognized as critical in *Estus,* 695 F.2d at 316. Relying on "public policy," the majority pays no deference to this expertise, failing even to acknowledge the importance of credibility determinations to the court's decision.

The majority concludes that the bankruptcy court's evaluation of LeMaire's motivation and sincerity in seeking Chapter 13 relief is clearly erroneous because the court's evaluation "fails to properly consider the strong public policy factors, inherent in the Bankruptcy Code, which are implicated in discharging [the] debt [to Handeen] and gives undue emphasis to the fact that the statutory terms governing Chapter 13 petitions do not expressly make a debt resulting from a willful and malicious injury nondischargeable."[14] *Ante* at 1351. The majority asserts that in reaching this conclusion it "accord[ed] due deference to [the

bankruptcy court's] credibility determinations." *Ante* at 1351. "Public policy," however, has nothing to do with an assessment of the credibility of LeMaire's testimony. Nor is it relevant to determining whether any of the other evidence before the bankruptcy court "was so 'implausible on its face that a reasonable factfinder would not credit it.'" *Ante* at 1351 (quoting *Bessemer City,* 470 U.S. at 575, 105 S.Ct. at 1512). The majority does not explain how the testimony and other evidence before the court was so facially implausible that a reasonable factfinder could not find, for instance, that LeMaire has made every attempt to reorder his life, substantial financial sacrifices, and a wholehearted attempt to pay Handeen as much as he is able. Instead, it simply focuses on the undisputed facts of LeMaire's attack on Handeen. This apparently is the "specific evidence," *ante* at 1350, which compels the majority to conclude that the bankruptcy court's determination of LeMaire's motivation and sincerity in seeking Chapter 13 relief is clearly erroneous. Notwithstanding its recitation of the principles set forth in *Bessemer City,* the majority's focus on the repugnant nature of LeMaire's crime and its corresponding reliance on "public policy" reveal that it rejects the bankruptcy court's determination of LeMaire's motivation and sincerity "simply because it is convinced that it would have decided the case differently." *Bessemer City,* 470 U.S. at 573, 105 S.Ct. at 1511. Merely reciting the restrictions on our power to reverse the bankruptcy court's factual findings is not enough. Rather, whatever our view of appropriate "public policy," we are constrained to abide by those restrictions when deciding whether the court's findings are clearly erroneous.

The erroneous premise underlying the majority's conclusion regarding LeMaire's motivation and sincerity is that LeMaire must be considered a dishonest debtor for

---

14. Contrary to the majority's view, the *express* terms of § 1328(a) make debts for willful and malicious injury *dischargeable* in Chapter 13. *See supra* at 1354; *infra* at 1360. To conclude otherwise because § 1328(a) uses the term "all debts," rather than specifically enumerating

each and every type of debt dischargeable in Chapter 13, flies in the face of clear congressional intent and does nothing to make the majority's "public policy" rationale more palatable.

whom Chapter 13 is unavailable because of the viciousness of the assault which gave rise to his debt to Handeen. This premise is contrary to the terms of § 1325(a)(3) and finds no support in the case law.[15] As the Seventh Circuit has stressed, § 1325(a)(3) requires that the plan be " '*proposed* in good faith' ..., not that the debt was incurred in good faith." *Smith*, 848 F.2d at 819 (emphasis added in *Smith*). Bankruptcy courts have recognized this important distinction. *See, e.g., In re Riggleman*, 76 B.R. 111, 112 (Bankr.S.D.Ohio 1987); *In re Manes*, 67 B.R. 13, 15–16 (Bankr.E.D.Ark. 1986); *In re Eppers*, 38 B.R. 301, 303–04 (Bankr.D.N.M.1984). In order to avoid the error committed by the majority, " '[c]are must be taken not to allow revulsion over a debtor's past deeds to detract from or im-pair a finding of good faith where that debtor is making an effort to satisfy past obligations to the extent possible and still embark upon a fresh start.' " *In re Belt*, 106 B.R. 553, 565 (Bankr.N.D.Ind.1989) (quoting *In re Chura*, 33 B.R. 558, 560 (Bankr.D.Colo.1983)). The bankruptcy court found that LeMaire was making just such an effort in his proposed plan. Yet, the majority's preoccupation with the heinous nature of LeMaire's crime leads it to ignore this finding and invoke "public policy" as grounds for rejecting the court's determination of LeMaire's motivation and sincerity in proposing his plan. The majority's use of this "public policy" rationale not only stems from an erroneous premise, it also misapprehends the fundamental purposes of Chapter 13 [16] and accords no def-

**15.** The cases relied upon by the majority, *see ante* at 1352 & n. 9, do not support its view that an individual is a "dishonest debtor" for purposes of § 1325(a)(3) if he or she proposes a plan that includes a debt incurred through dishonest or other bad faith conduct. *In re May*, 12 B.R. 618 (N.D.Fla.1980), and *In re Shapiro*, 59 B.R. 844 (Bankr.E.D.N.Y.1986), were liquidation cases addressing the grounds for denying the debtor a general discharge under § 14c of the Bankruptcy Act and its successor, 11 U.S.C. § 727(a). The comparable provisions in Chapter 13 are § 1328(e), which provides for the revocation of the debtor's discharge if it was obtained through fraud, and 11 U.S.C. § 1330(a), which provides for the revocation of a confirmation order if it was procured by fraud.

The majority's misplaced reliance on language from *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982), is even more indicative of the absence of support for its position. The "dishonest scheme" referred to in that case was a situation where "a debtor ... obtain[s] money, services or products from a seller by larceny, fraud or other forms of dishonesty and then keep[s] his gain by filing a Chapter 13 petition within a few days of the wrong," thereby allowing "the debtor to profit from his own wrong ... through the Chapter 13 process." *Id.* at 432. In *Okoreeh–Baah*, 836 F.2d at 1031–34, the Sixth Circuit clarified the meaning of the language used in *Memphis Bank*, holding that *Memphis Bank* did not establish a *per se* rule requiring full payment of debts arising from dishonest prepetition conduct, but rather good faith under § 1325(a)(3) must be determined by examining the totality of the circumstances surrounding the debtor's proposed plan. *See also Smith*, 848 F.2d at 819 n. 6 (rejecting the majority's position because such a reading of *Memphis Bank* "ignore[s] Chapter 13's plain language").

**16.** Quoting *In re May*, 12 B.R. at 621, a liquidation case under the old Bankruptcy Act, the majority suggests that the overriding purpose of the Act (and therefore of the Bankruptcy Code) was " 'the collection and distribution of the debtor's estate to his creditors.' " *Ante* at 1352. The Supreme Court, however, stated that "the basic purpose of the Bankruptcy Act [was] to give the debtor a 'new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.' " *Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 113–14, 27 L.Ed.2d 124 (1970) (per curiam) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)); *see also Bostwick v. United States*, 521 F.2d 741, 746 (8th Cir.1975) (purpose of Act was "to rehabilitate the debtor in order that the debtor might be motivated to lead a full and productive economic life"). Providing the debtor with a fresh start remains the basic purpose underlying Chapters 7 and 13 of the Code. *See, e.g., In re Pettit*, 61 B.R. 341, 347 (Bankr.W.D. Wash.1986); *In re Goodwin*, 58 B.R. 75, 77 (Bankr.D.Me.1986). As stated in the legislative history to the Code, providing "relief and [a] fresh start for the debtor ... is the essence of modern bankruptcy law." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 117 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6078. Chapter 13 is designed to encourage the debtor to obtain a fresh start through "rehabilitation rather than liquidation." *In re Thompson*, 894 F.2d 1227, 1232 (10th Cir.1990). Congress accordingly tailored the discharge provisions of Chapters 7 and 13 to the way in which the debtor earns a fresh start under those chapters. Thus, whereas in Chapter 7 a discharge is granted in exchange for liquidation of the debtor's existing nonexempt assets for the benefit of creditors, in Chapter 13 a broader discharge is granted in exchange for the debtor's payment of

erence to the bankruptcy court's judgment that LeMaire's plan satisfies those purposes. As the Sixth Circuit has correctly observed, in making the good faith factual finding the bankruptcy court must examine the totality of the circumstances and "ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources. The decision should be left simply to the bankruptcy court's common sense and judgment." *Okoreeh–Baah*, 836 F.2d at 1033; *see also Smith*, 848 F.2d at 822 (determination of good faith left to "bankruptcy court's common sense and judgment").

## II.

The majority bases its decision on the bankruptcy court's treatment of two of the *Estus* factors: (1) whether the plan includes a debt that is nondischargeable in Chapter 7, and (2) the debtor's motivation and sincerity in seeking Chapter 13 relief. However, with respect to both factors, the majority cites a single error: the bankruptcy court's failure to accord sufficient weight to a "public policy" against the discharge of debts such as that owed to Handeen.[17] The majority does attempt to show that the court also erred in its treatment of other factors, but as will be seen, this attempt is anything but persuasive. Moreover, it is mere window dressing because the majority leaves no doubt that it holds "public policy" alone requires reversal in this case. *Ante* at 1351, 1353. As

demonstrated above, the fact that a Chapter 13 plan provides for less than full payment of a debt nondischargeable in Chapter 7, however egregious the conduct that gave rise to the debt, is simply not sufficient to support a finding of bad faith, let alone reverse a bankruptcy court's finding of good faith under the clearly erroneous standard.

The majority believes the bankruptcy court erred by not addressing the argument that LeMaire's failure to list a contingent debt to the United States Public Health Service in his plan demonstrated a lack of good faith. *Ante* at 1351. The majority fails to recognize that Handeen never made this argument to the bankruptcy court. This argument first appears in Handeen's briefs to this court. More importantly, we made it plain in *Estus* that an inaccuracy in the debtor's plan cannot be considered in isolation, but rather the inquiry into good faith must determine "whether any inaccuracies are an attempt to mislead the court." 695 F.2d at 317.[18] The bankruptcy court found that LeMaire had made no attempt to mislead the court. This finding is clearly correct because the evidence establishes that the inaccuracy here was simply the result of an honest mistake. LeMaire testified that he was receiving a stipend from the federal government as part of a specialized program to train scientists who will go on to do research into drug abuse. The stipend was to continue until the conclusion of his three-year postdoctoral research fellowship. LeMaire testified that, under his agreement with the federal government, a year of the stipend would then be forgiven

---

a portion of his income to creditors over a period of three to five years. *See In re Otero*, 48 B.R. 704, 706 (Bankr.E.D.Va.1985) ("Chapter 13 is a distinct chapter of the Bankruptcy Code enacted by Congress with its own, liberal discharge provision.").

**17.** The majority wisely declines to find any error in the bankruptcy court's determinations regarding LeMaire's financial dealings with his parents. *Ante* at 1351 n. 6. These determinations are fully supported by the record. After hearing lengthy testimony on LeMaire's financial relationship with his parents, the court expressly found that there was no collusion in LeMaire's agreeing to pay his parents rent.

"Furthermore, what Handeen asks is not for the debtor to make further financial sacrifices, but that his parents be required to make further financial sacrifices by waiving any rent. I do not think that that is a proper purpose of Chapter 13 nor a proper inquiry by a court in this context." Order at 8. I agree.

**18.** In *Estus*, 695 F.2d at 316, we concluded that the proper inquiry into good faith should follow the analysis adopted by the Fourth Circuit in *Deans v. O'Donnell*, 692 F.2d 968 (4th Cir.1982). The Fourth Circuit described the factor relevant here as "the debtor's honesty in representing facts." *Id.* at 972.

for each year he worked as a research scientist in the drug abuse field. LeMaire stated further that he expected his fellowship to be renewed for a third year and that he had already been offered a post-fellowship research position with a University of Minnesota scientist at a yearly salary of $18,500. LeMaire testified that he did not list his stipend as a debt because he fully intended to accept this position, which would allow him to satisfy his obligation under the federal program without paying back any of the stipend. LeMaire's attorney told the bankruptcy court that in retrospect he felt a mistake had been made in the schedules, a mistake for which he was responsible, and explained that the contingent debt was not listed in the schedules because of LeMaire's long-standing intention to continue on with his research career. The majority seems to think that LeMaire's frank and open testimony regarding his contingent liability under the federal training program is evidence of bad faith. I disagree completely. It strikes me as utterly implausible that such testimony could in any way be construed as an attempt to mislead the bankruptcy court.

The majority also suggests that LeMaire's failure to include in his plan the contingent liability to pay back his stipend constituted preferential treatment of a creditor evidencing bad faith. *Ante* at 1350 n. 5. I disagree. The only way LeMaire could arrange to pay back a percentage of this contingent debt equal to that paid other unsecured creditors would be to intentionally breach his agreement with the federal government. He would have to work as a research scientist in the drug abuse field for a certain period of time and then quit when his contingent liability had been reduced to 42.3 percent of the total stipend he had received. In addition, after abandoning the career for which he had spent many years preparing, LeMaire would have to find other employment lucrative enough to enable him to pay back this portion of his stipend on top of the dividend to his other unsecured creditors. All of this would have to be set forth in LeMaire's Chapter 13 plan. The import of the majority's analysis is that LeMaire's failure to

undertake such an obviously irrational course of action is evidence of bad faith.

The majority's final attempt to show that the bankruptcy court committed additional errors (beyond its alleged failure to adequately consider "public policy") is equally unavailing. The majority concedes the bankruptcy court "examined in detail" each of the relevant factors we set forth in *Estus. Ante* at 1350. After carefully considering these factors and "all the circumstances of this case," the court was "convinced that the debtor's plan is not an abuse of the provisions, purpose or spirit of Chapter 13 and is proposed in good faith." Order at 14. This is precisely the inquiry required by *Estus*, 695 F.2d at 316. Nevertheless, the majority concludes that the bankruptcy court erred because its order does not specifically discuss whether LeMaire has attempted to "unfairly manipulate the Bankruptcy Code." *Ante* at 1351. This phrase is taken from our decision in *Zellner*, 827 F.2d at 1227, which, as the majority acknowledges, "preserved the traditional 'totality of circumstances' approach with respect to *Estus* factors not addressed by the [1984] legislative amendments." *Ante* at 1349 (citing *In re Smith*, 848 F.2d 813, 820 n. 8 (7th Cir.1988)). The majority fails to note that, after quoting the relevant passage from *Zellner*, the Seventh Circuit found in *Smith* that "[t]he test of whether the debtor 'has unfairly manipulated the Bankruptcy Code' is equivalent to the traditional *Rimgale* test." 848 F.2d at 820 n. 8. *In re Rimgale*, 669 F.2d 426, 431–33 (7th Cir.1982), like *Estus*, set forth a list of relevant factors and defined the proper inquiry as whether under the totality of the circumstances the debtor's plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13. *See Smith*, 848 F.2d at 817–18, 820 n. 8. Our use of the phrase in *Zellner* was followed by supporting citations to both *Estus* and *Rimgale*. It is clear that the phrase "unfairly manipulated the Bankruptcy Code" was either another expression for the abuse of Chapter 13 under the totality of the circumstances, as the Seventh Circuit found, or was simply a shorthand reference to some

of the *Estus* factors that remained applicable after the 1984 amendments to Chapter 13. *See Zellner*, 827 F.2d at 1227 (although amendments subsumed many of the *Estus* factors, bankruptcy court must still "look at *factors such as* ... whether [the debtor] has unfairly manipulated the Bankruptcy Code") (emphasis added) (citing page in *Estus* where factors listed). The majority, however, suggests that our use of this phrase in *Zellner* established a new and independent factor that the bankruptcy court must expressly consider in examining a debtor's good faith.[19] This is a distortion of our holding in that case. In *Zellner*, 827 F.2d at 1227, "the bankruptcy court erroneously concluded that the inquiry into good faith ended with the determination that [the debtor] had committed all of his disposable income to the plan." Yet, we affirmed its determination of good faith because we believed "the court's factual findings *implicitly* support[ed] a finding that there was *no abuse of the bankruptcy laws*." *Id.* (emphasis added). I fail to see how the majority can find the asserted error in the bankruptcy court's thorough inquiry into LeMaire's good faith when in *Zellner* neither the bankruptcy court nor this court specifically discussed whether the debtor had unfairly manipulated the Bankruptcy Code.[20] In sum, I am not convinced by the majority's attempt to rewrite our holding in *Zellner*. The bankruptcy court's determination that LeMaire's proposed plan was not an abuse of the bankruptcy laws obviously included an implicit finding that he had not unfairly manipulated those laws.

Ultimately, the most disturbing aspect of the majority's decision is the invocation of "public policy" to justify its holding that the bankruptcy court's finding of good faith under § 1325(a)(3) is clearly erroneous. Citing no authority to support its position, the majority purports to find the source of this controlling "public policy" in § 523(a)(6), which prohibits the discharge of debts for willful and malicious injury in Chapter 7 cases. By its own terms, § 523(a) does not extend to a discharge under § 1328(a) in Chapter 13. In § 1328(a), Congress explicitly enacted a policy that permits the discharge of debts for willful and malicious injury in Chapter 13 cases. Section 1328(a) makes "all debts" dischargeable in Chapter 13 outside of a short list of exceptions. " 'Congress could have easily added more exceptions to the list in § 1328(a) had it so intended.' " *Smith*, 848 F.2d at 818–19 (quoting *Chaffin*, 816 F.2d at 1074).[21] On the basis of the clear congressional intent embodied in §§ 523(a) and 1328(a), I reject the majority's conclusion that the policy expressed in § 523(a)(6) can compel a finding that a Chapter 13 plan such as LeMaire's was proposed in bad faith. "Our task is to construe the statute, not to construct it." *Deans v. O'Donnell*, 692 F.2d at 971. Accordingly, we may not interpret the good faith requirement of § 1325(a)(3) in such a way as to substitute our own policy preference for that of Congress. The majority clearly believes that the confirmation of LeMaire's plan was unjust in light of the vicious nature of his attack on Handeen.

19. If the majority truly believes that the bankruptcy court did not inquire adequately into particular factors relevant to good faith, then it should remand for reconsideration because we may not make a *de novo* determination of that issue. *See Estus*, 695 F.2d at 317; *Smith*, 848 F.2d at 822.

20. The majority states that "the facts and circumstances of this particular case merited at least some discussion of whether LeMaire had attempted to unfairly manipulate the Bankruptcy Code," *ante* at 1352 n. 7, but does not explain why the facts and circumstances of *Zellner* did not likewise merit such a discussion. Why is a bankruptcy court required to specifically discuss "unfair manipulation" when the debtor's proposed plan includes a debt for willful and malicious injury, but not when the plan includes other debts nondischargeable in Chapter 7, such as the student loans in *Zellner?* The majority cannot answer this question because there is no principled basis for drawing such a distinction.

21. That Congress specifically intended to make debts covered by § 523(a)(6) dischargeable under § 1328(a) is further evidenced by § 1328(c), which expressly provides that any debt specified in § 523(a) is not included within the hardship discharge of § 1328(b).

However, the remedy lies with Congress, not the judiciary.