**In re David James CARSRUD, Social Security No. 503–74–2204, Debtor.**

**Bankruptcy No. 93–40051.**

United States Bankruptcy Court, D. South Dakota, S.D.

Nov. 30, 1993.

Attorney A. Thomas Pokela, Successor Chapter 13 Trustee, Sioux Falls, SD.

Robert L. Jones, Sioux Falls, SD, for debtor David James Carsrud.

Richard D. Casey, Sioux Falls, SD, for creditor Laurie Carsrud.

PEDER K. ECKER, Bankruptcy Judge.

Two objections have been made to confirming Debtor's Chapter 13 plan of reorganization. The first objection was filed by Chapter 13 Trustee Rick A. Yarnall, succeeded by A. Thomas Pokela, and the second objection was filed by Sioux Falls Attorney Richard D. Casey on behalf of creditor Laurie Carsrud. This is Debtor's second attempt to reorganize under Chapter 13, a voluntary petition filed one week after an earlier petition was dismissed for exceeding the $100,000 statutory jurisdictional limit set forth in 11 U.S.C. § 109(e). Following the dismissal, Debtor made a number of preference payments to other creditors in order to be eligible for this second filing. The objections to plan confirmation state that the circumstances surrounding this second filing, coupled with the nature of a judgment rendered against Debtor for the sexual assault (including rape) of his natural sister, Laurie Carsrud, indicate the plan was not filed in good faith. After an evidentiary hearing, the Court took the matter under advisement. This letter decision constitutes Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

## CASE SUMMARY

This case involves two very targeted attempts to discharge a debt arising out of Debtor's pre-petition wrongful conduct. At the end of 1990, a state court jury unanimously rendered a civil judgment against Debtor for the sexual assault (including rape) of his natural sister, Laurie Carsrud [hereinafter "Carsrud"]. This willful and malicious act no doubt resulted in grievous physical, emotional, and psychological injuries that will likely affect Carsrud into the future. The $81,618 judgment reflects the heinous nature of this offense inasmuch it includes $10,000 punitive damages. Debtor has never accepted responsibility for his actions or for the resulting debt inasmuch as he has made no attempt to voluntarily repay the judgment. The only payments Carsrud has received have been the result of her efforts to garnish Debtor's wages or levy against his inheritance.

Motivation and sincerity, coupled with the nature of this debt and whether it is dischargeable in Chapter 7, are the most centrally implicated factors in this case, and when those factors are applied here, the true "big picture" of this bankruptcy is revealed to support the conclusion that this plan is an abuse of the provisions and spirit of Chapter 13 rehabilitation and has not been proposed in good faith. At trial, Carsrud testified Debtor has repeatedly harassed her at work to the point that she has obtained two protection orders against him and fears for her safety. Debtor also called his mother on her birthday threatening he would leave and never be seen again if Carsrud persisted in objecting to his bankruptcy. Considering Debtor's overall attitude about the bankruptcy process, the nature of this debt, the relationship between Debtor and creditor Carsrud, Debtor's evasive conduct in making voluntary repayments, the fact the debt would be nondischargeable under Chapter 7, the

preferential activity that took place so Debtor could qualify for Chapter 13 relief, the fact Debtor repeatedly miscalculated the amount of the Carsrud judgment, the blatantly targeted relief being sought, and the fact there is no meaningful repayment proposed for the judgment convince the Court this plan is not proposed in good faith; rather, it is simply Debtor's slick scheme to shun the state court's verdict and euchre his sister from obtaining a meaningful recovery. The objections to confirmation are sustained.

## BACKGROUND

*The First Chapter 13 Petition for Relief*

On December 18, 1992, Debtor filed a Chapter 13 petition for relief and a proposed plan of reorganization. The petition and schedules listed two secured claimants, Laurie Carsrud [hereinafter "Carsrud"], with a 1990 judgment for $82,000,[1] and Sioux Falls Attorney Patrick J. Kane, with two claims, one for $5,800 [2] and another for $1,750.[3] The remaining twenty-two or so claimants were described as unsecured, with claims totaling $2,804.34.

In this first proceeding, Debtor offered to pay $3,471.65 under a five-year plan,[4] $1,709 of which would be paid against Carsrud's "secured" claim. The remaining sum would be paid toward other creditors, but in a manner inconsistent with the classification provided in the petition and schedules. For example, the plan reclassified Attorney Kane's claims as unsecured and treated them separately from the other unsecured claims. And a criminal restitution claim of $80 held by the Minnehaha County State's Attorney was reclassified as secured and, according to the plan, would be fully paid. The plan stated as its "features" the fact that all creditors would receive as much as if this were a Chapter 7 liquidation proceeding; that two claims "arguably not dischargeable under Chapter 7" were being treated separately and "allowed a greater share of Debtor's future earnings"; and that the proposed plan was a "best efforts" plan since all earnings above reasonable living expenses were devoted to repay debts.

The Chapter 13 Trustee objected to the plan and raised several issues:

- Whether Attorney Kane, as a judgment creditor listed on the schedules, had a conflict of interest representing Debtor in the bankruptcy proceeding;

- Whether Debtor qualified for Chapter 13 relief as limited by 11 U.S.C. § 109(e);

- Whether the judgment creditors described on Schedule D as "secured" might actually be unsecured;

- Whether Debtor could substantiate certain monthly expenses reported on the schedules;

- Whether the plan was meaningful;

- Whether Debtor met the net disposable income requirement of 11 U.S.C. § 1325(b); and

- Whether Debtor could provide additional information regarding an anticipated inheritance.

Ten days after the case was filed, Carsrud moved for dismissal pursuant to 11 U.S.C. § 109(e). Carsrud's computations showed that her judgment alone exceeded $100,000: the initial award of $81,618, plus accrued interest of $20,105.31 (calculated from the

---

1. The exact amount of the November 28, 1990, judgment was $81,618: $71,618 for actual damages and $10,000 for punitive damages, plus costs of $149.62. The judgment accrues interest at the rate of twelve percent.

2. Attorney Kane defended Debtor in Carsrud's civil suit for sexual assault. On December 20, 1990, a $5,800 civil judgment was granted to Kane for the fees associated with that legal defense.

3. Anticipating the receipt of approximately $2,500 as the legatee of a probate estate, Debtor executed an assignment in favor of Attorney

Kane for handling the bankruptcy proceeding, including the payment of the required filing fee. This Court entered an order directing the state court to distribute the entire legacy to the bankruptcy estate and requiring Attorney Kane to deposit the sum in his Attorney Trust Account pending further order. The $1,750 attorney fees, related to the first bankruptcy proceeding, were subsequently cancelled after the case was dismissed.

4. Payments would be made via 26 bi-weekly wage deductions of $26.71.

date of judgment to the date of filing), less $946.50 paid pursuant to various wage garnishments obtained during 1992,[5] resulted in an unpaid judgment of $100,776.81. Shortly thereafter, Debtor stipulated to the entry of an order dismissing the case, but "with the understanding" that he could re-file when in "compliance with the $100,000 unsecured limit." The case was dismissed January 22, 1993.

### The Interim

During the interim span of exactly one week between the dismissal and the re-filing, Debtor negotiated settlement agreements with the unsecured creditors listed in the first petition. The settlements, which varied anywhere from $15 to $500,[6] satisfied all the unsecured creditors' claims. At about the same time the case was dismissed, Debtor was scheduled to receive an inheritance, and Carsrud made a demand for execution on the inheritance. Subsequent to the demand, on January 25, 1993, Debtor offered a portion of the inheritance in exchange for partial satisfaction of the judgment, but the offer was refused since the entire sum was not offered. Two days later, January 27, 1993, a Notice of Levy was served, and Debtor paid $2,100 to the Minnehaha County Constable and kept

the balance as exempt property.[7] The settlement payments and the levy proceeds were sufficient to reduce the amount of unsecured debt to less than $100,000.

### The Second Chapter 13 Petition for Relief

On January 29, 1993, Debtor filed the current Chapter 13 petition seeking to reorganize three debts: 1) Carsrud's judgment, listed as $99,669.29, stated to be secured by "all non-exempt property and 20% of wages";[8] 2) an $830 claim by Debtor's landlord, Ann Wagner, secured by a car, household goods, an I.R.S. tax refund, a rent deposit, and a diamond ring; and 3) a $1,225 claim by Debtor's current attorney. The proposed five-year plan offers to pay $75 per month, based on a wage assignment of $34.62 every two weeks. The landlord and attorney claims will be paid in full. The plan then states, "[T]hereafter and through the sixty months of the plan, such net sum as may be available to unsecured creditors." No other provisions or explanations are made, but apparently this provision is intended to treat Carsrud's judgment despite the fact Debtor lists Carsrud as a secured creditor.

On April 13, 1993, Trustee Yarnall objected to the plan,[9] noting that, as a preliminary

---

5. No voluntary payments were made against the Carsrud judgment, but $946.50 was collected through wage garnishment:

| | |
|---|---|
| March 17, 1992 | $ 93.19 |
| March 23, 1992 | 93.76 |
| April 3, 1992 | 92.75 |
| April 15, 1992 | 94.74 |
| August 12, 1992 | 95.03 |
| September 11, 1992 | 96.36 |
| October 1, 1992 | 92.59 |
| October 14, 1992 | 96.36 |
| October 16, 1992 | 96.17 |

6. Pre-petition, Debtor paid $1,846.59 to unsecured creditors, in varying amounts:

| | |
|---|---|
| McKennan Hospital | $120 |
| Leah Meyer | 150 |
| Sioux Falls Cable Television | 40 |
| Crow Bar | 80 |
| Sears | 500 |
| Larry's Amoco | 20 |
| U.S. West arrears | 75 |
| U.S. West hookup | 60 |
| Car expenses | 250 |
| Allied Collection | 20 |
| Bradfelt Collection | 50 |
| June Carsrud | 35 |
| Court Services | 80 |
| Hauge Associates | 20 |

| | |
|---|---|
| Jerry Matzen | 20 |
| Myron Spindler | 20 |
| JAMZ Nightclub | 10 |
| Pomp Room Bar | 15 |
| Sportsman's Bar | 80 |
| Roy Seaverson | 21.59 |
| Time Loan Plan, Inc. | 50 |
| Vali chek | 50 |
| Ann A. Wagner back rent deposit | 80 |

7. Carsrud did not personally receive payment until February 8, 1993, at which time, it was deposited in the Chapter 13 Trustee's Trust Account. Based on this February date, Carsrud sought to dismiss the second petition pursuant to Section 109(e). The motion failed, however, since levy proceeds were received on her behalf, prior to the second filing, by the county constable, a duly authorized officer of the court.

8. Carsrud's Proof of Claim, dated April 29, 1993, reports the unpaid judgment as $98,930.07 and contends it is an unsecured debt since total assets are listed at $1,100.75.

9. On May 26, 1993, Trustee Yarnall filed a "Resignation of Trustee," and after filing a final accounting of funds received, the Court approved

matter, confirmation could not proceed since Debtor failed to appear at a March 29, 1993, meeting of creditors.[10] The Trustee also requested certain information, including:

1) an itemized statement of all payments made to creditors in the last 120 days;
2) documentation to explain the nature of Ann Wagner's claim and to indicate how the security interest was established; and
3) documentation to substantiate monthly living expenses, including food and transportation, and information to indicate if anyone contributes to Debtor's living expenses.

Substantively, the objection states that, in light of the nature of the Carsrud judgment, the plan is not proposed in good faith—Debtor paid a 100% dividend to all unsecured creditors except Carsrud, and Debtor should be obligated to recoup the preference payments and make a proper redistribution. Further, the plan proposes to pay attorney fees, which is improper in this case since any fees exceeding $1,000 must be approved by the Court through separate application as required by Bankruptcy Rule 2016(a). The objection also states Debtor fails to offer all net disposable income pursuant to Section 1325(b).

Carsrud also filed a good faith objection to confirmation based on the facts of this case. Debtor was convicted of sexual assault and ordered to pay both actual and punitive damages. This conduct gave rise to Carsrud's claim and, as such, should enable the Court to rule as a matter of law that the plan lacks good faith. The objection also contends the circumstances surrounding the re-filing indicate a lack of good faith. For example, the first petition incorrectly stated Carsrud's claim and failed to take into account accrued interest, which, even after deducting garnish-

ment payments, resulted in an unpaid judgment greater than $100,000—not to mention other additional unsecured debt of approximately $10,350. Clearly, Debtor was ineligible for Chapter 13 relief. After dismissal, Debtor simply paid most of the creditors listed in the first petition, but without making any voluntary effort to pay on Carsrud's judgment. This action created eligibility for a second filing. In summary, the objection states, "Debtor is attempting to deny to whatever extent possible the creditor, Laurie Carsrud, from receiving money justly due her pursuant to the Judgment."

## DISCUSSION

█ If a plan proponent demonstrates the Chapter 13 plan has been proposed in good faith and not by any means forbidden by law, it shall be confirmed. 11 U.S.C. § 1325(a); *In re Cordes*, 147 B.R. 498, 502 (Bankr.D.Minn.1990). "Good faith" is not a sole condition to obtaining confirmation, but it is "an essential element underpinning any Chapter 13 filing." *In re Rogers*, 140 B.R. 254, 255 (Bankr.W.D.Mo.1992), *citing In re LeMaire*, 898 F.2d 1346 (8th Cir.1990). Although the term has not been defined, its purpose has been "to assure that those who invoke the reorganization provisions ... do so only to accomplish the aims and objectives of bankruptcy philosophy and policy and for not other purpose." *In re Cordes*, 147 B.R. at 503. *See In re Terry*, 630 F.2d 634 (8th Cir.1980).

During the early 1980s, the Eighth Circuit Court of Appeals adopted a totality of circumstances approach for determining good faith and included a list of 11 non-exclusive factors that may be relevant in making the analysis. *In re Estus*, 695 F.2d 311 (8th Cir.1982).[11] Most of those factors were sub-

---

the Trustee's report and discharged the Trustee June 10, 1993. On May 28, 1993, the United States Trustee's Office, by and through Charles L. Nail, Jr., filed a "Notice of Appointment of Successor Trustee," naming A. Thomas Pokela as Successor Trustee.

**10.** The Section 341 meeting was rescheduled and concluded July 2, 1993.

**11.** The *Estus* court identified the following factors as meaningful in making a determination of good faith:

1. the amount of the proposed payments and the amount of the debtor's surplus;
2. the debtor's employment history, ability to earn and likelihood of future increases in income;
3. the probable or expected duration of the plan;

sumed by the 1984 enactment of 11 U.S.C. § 1325(b),[12] which narrowed the good faith inquiry to whether debts and expenses are stated accurately; whether there is any fraudulent misrepresentations to mislead the bankruptcy court; or whether there is an unfair manipulation of the Bankruptcy Code; however, the traditional totality of circumstances approach with respect to *Estus* factors not addressed by the legislative amendments were preserved. *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1226 (8th Cir.1987); *In re LeMaire*, 898 F.2d at 1349.

 A good faith analysis still requires a separate, independent examination to determine if the plan "constitutes an abuse of the provisions, purpose or spirit of Chapter 13. The bankruptcy court must utilize its fact-finding expertise and judge each case on its own facts after considering all the circumstances of the case." *In re Estus*, 695 F.2d at 316. And because each set of facts is unique, the cumulative circumstances must be considered only after giving appropriate weight to each factor, as illustrated by *In re LeMaire*, where the bankruptcy court's finding of good faith was reversed, having failed to give due emphasis to two relevant *Estus* factors, which, when considered with the remaining evidence, made a determination of good faith implausible on its face. The two factors were: 1) the debtor's motivation and sincerity in seeking Chapter 13 relief; and 2) the nature of the debt and whether it was dischargeable in Chapter 7.

Factually, the debtor intended to kill his victim by firing nine rifle shots at him, five of which actually struck. *In re LeMaire*, 898 F.2d at 1347. The debtor pled guilty to aggravated assault, was sentenced to prison, and served 27 months. *Id.* A civil suit was filed and consent judgment obtained, but the debtor paid only $3,000 on the judgment, prompting the victim to commence garnishment proceedings to collect the remaining $50,362.50 balance. *Id.* Shortly thereafter, debtor filed a Chapter 13 petition. *Id.* The victim objected to the plan, stating that the civil judgment stemming from the debtor's criminal conduct could not be discharged, an argument premised on Section 523(a)(6) which states that a debt arising from infliction of a willful and malicious injury by the debtor may not be discharged under specified sections of the Bankruptcy Code. *Id.* at 1348. This argument failed, however, since Section 523(a)(6) does not extend to Chapter 13 filings. In the alternative, the victim argued the plan was not filed in good faith, an argument which also, initially, failed.

In its good faith analysis, motivation and sincerity were considered, and the bankruptcy court found the debtor's desire for a fresh start was more favorable than the victim's desire to be compensated, since the debtor had paid his debt to society by serving a prison sentence, and forcing the debtor to be burdened the rest of his life with a judgment which would continue to accrue interest, result in endless garnishments, and prevent him from accumulating property would be inimical to a fresh start. The Eighth Circuit disagreed. *Id.* at 1350. Granted, the most egregious pre-petition conduct can be overcome by "other" factors that indicate good faith, but there were none. The bankruptcy court did not even discuss whether the debtor had unfairly manipulated the Bankruptcy Code. Simply stated, this debtor shot the

4. the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

5. the extent of preferential treatment between classes of creditors;

6. the extent to which secured claims are modified;

7. the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

8. the existence of special circumstances such as inordinate medical expenses;

9. the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

10. the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

11. the burden which the plan's administration would place upon the trustee.

*In re Estus*, 695 F.2d at 317.

12. Section 1325(b) provides that if a creditor objects to confirmation and the plan proposes less than full payment of the creditor's claim, the plan may be approved only if it includes all of the debtor's projected disposable income for the plan's three-year period.

victim nine times with the intent to kill and then sought the protection of bankruptcy when the victim tried to collect his judgment. *Id.* at 1352–53.

The Eighth Circuit was also bothered by the insufficient emphasis given to the nature of the debt and whether it was dischargeable in Chapter 7. Although Section 523(a)(6) does not apply to Chapter 13, the court stated:

> We are convinced that the court's analysis here fails to properly consider the strong public policy factors, inherent in the Bankruptcy Code, which are implicated in discharging this debt and gives undue emphasis to the fact that the statutory terms governing Chapter 13 petitions do not expressly make a debt resulting from a willful and malicious injury nondischargeable.

*Id.* at 1351. This debt arose from willful and malicious injury following an attempted murder—and there is a "particularly strong policy prohibiting the discharge of a debt resulting from a willful and malicious injury following an attempted murder." *Id.* at 1353.

■ The decision to reverse was based not only on the failure to examine the public policies promoted by not discharging this debt, but also on the inherent policies of Chapter 13 relief, which are, primarily, to collect and distribute a debtor's estate to creditors and, secondarily, to provide an honest debtor with the benefit of a discharge. *Id.* at 1352.

The *LeMaire* rationale was deemed broad enough to encompass civil liability resulting from the debtor's sexual abuse of a minor in the case of *Noreen v. Slattengren,* 974 F.2d 75 (8th Cir.1992). Eleven days before the civil suit trial, the debtor filed a Chapter 13 petition and proposed a plan offering to pay $200 a month for three years. *Id.* The victim filed a good faith objection, which prompted the debtor to file an amendment offering $500 a month for five years. *Id.* at 76. The bankruptcy court found the plan was not proposed in good faith, a decision that was affirmed based on circumstances including the timing of the filing in relation to the trial, the "targeted" nature of the bankruptcy relief sought, and the "meager" repayment plan. *Id.* at 77. The court noted

bad faith may be indicated when a debtor resorts to Chapter 13 when a major portion of the claims sought to be discharged arise out of pre-petition wrongful conduct and where the debtor proposes only a minimum repayment plan. *Id., quoting Neufeld v. Freeman,* 794 F.2d 149, 153 (4th Cir.1986).

■ The *LeMaire* and *Noreen* decisions stand for the proposition that public policy prevents a debtor convicted of a serious criminal offense from "significantly impairing" a victim's right to obtain a civil recovery. *In re Sitarz,* 150 B.R. 710, 722 (Bankr. D.Minn.1993). These cases also suggest, and certainly do not limit such an argument in cases where particularly horrifying physical or psychological injuries, other than attempted murder or sexual assault involving a minor, exist. A good faith stance based on public policy should take into account the relationship between the debtor and objecting creditor—personal versus legal; individual versus institution—and then consider the impact of the conduct, not only at the time of infliction, but in the future as well. *Id.*

In *In re Edwards,* 132 B.R. 400 (Bankr. W.D.Ark.1991), the debtor's total unsecured debts were $35,858.43, and virtually all of that amount, $24,914.70, was the result of a jury's restitution award rendered in a state court criminal prosecution where the debtor was found guilty of second degree battery, sentenced to prison, and fined $10,000. *Id.* at 401. The battery victim objected to the "best efforts" plan which proposed to pay administrative costs, the filing fee, and attorney's fees. *Id.* at 402. The plan singled out the criminal fine, proposing full payment, no doubt because it would be nondischargeable and because the debtor feared he would be reincarcerated if he failed to pay it. *Id.* The debtor also incorrectly listed the victim's claim as $24,000 instead of $24,914.70. *Id.* at 403. Based on all the circumstances, including the fact the debtor understated his income and overstated his expenses, there was sufficient evidence to show a lack of good faith: the debtor failed to propose a meaningful plan and was trying to manipulate the Bankruptcy Code. *Id.*

■ This line of cases identifies numerous relevant factors and illustrates how important their total cumulative effect can be in determining the issue of good faith. Some of the factors include pre-petition conduct, motivation and sincerity, personal and financial goals being sought, and the debtor's attitude toward the integrity of the bankruptcy process. ·

### DECISION

■ This case involves two very targeted attempts to discharge a debt arising out of Debtor's pre-petition wrongful conduct. At the end of 1990, a state court jury unanimously rendered a civil judgment against Debtor for the sexual assault (including rape) of his natural sister. This willful and malicious act no doubt resulted in grievous physical, emotional, and psychological injuries that will likely affect Carsrud into the future. The $81,618 judgment reflects the heinous nature of this offense inasmuch it includes $10,000 punitive damages. Debtor has never accepted responsibility for his actions or for the resulting debt inasmuch as he has made no attempt to voluntarily repay the judgment. The only payments Carsrud has received have been the result of her efforts to garnish Debtor's wages or levy against his inheritance.

Debtor's first Chapter 13 petition was filed at the close of 1992. The sum of the debt listed at that time was $92,354.34—an erroneous figure since Debtor listed Carsrud's judgment as $82,000 instead of $81,618 and then failed to add $20,105.31 interest which had accrued from the time of the judgment to the date the petition was filed. Debtor also erred by stating the judgment was secured when it was clearly unsecured. Carsrud moved to dismiss the case pursuant to the jurisdictional limits of Section 109(e). Debtor stipulated to the entry of an order of dismissal but was motivated to add the caveat, "with the understanding he may re-file when he can come into compliance with the $100,000 unsecured limit."

Subsequent to dismissing the first petition, Debtor negotiated, settled, and paid $1,846.59 to all of the creditors listed as unsecured on the original petition. Debtor managed to manipulate his financial affairs in a very short time in order to establish Chapter 13 eligibility and file a second petition just seven days after the first was dismissed. At this point in time, however, the only debts to be "reorganized" were attorney fees, past-due rents, and, of course, Carsrud's judgment.

In both bankruptcy proceedings, Debtor has offered less than a fair return to creditor Carsrud, a sign of his true sincerity and desire to significantly impair her right to a meaningful recovery. The first plan proposed to pay $1,709 or approximately 2% of the judgment, yet ensured a 100% payout on a criminal restitution claim. The second plan proposes total payments of approximately $4,500, roughly half of which will be used to fully pay the landlord and attorney claims. The remaining sum will go toward the Carsrud judgment which represents a return of about 2.4%. This is less than meager. The discharge provisions of Chapter 13 were intentionally broadened in comparison to Chapter 7, hoping to provide debtors faced with alternative liquidation under Chapter 7 greater incentive to perform under a Chapter 13 plan—especially where debt is otherwise not dischargeable in Chapter 7. Obviously, Debtor is not incited to effectuate the kind of financial rehabilitation contemplated by Chapter 13 reorganization. Such discernment invokes the strong public policy considerations found in *LeMaire* and *Noreen*.

Motivation and sincerity, coupled with the nature of this debt and whether it is dischargeable in Chapter 7, are the most centrally implicated factors in this case, and when those factors are applied here, the true "big picture" of this bankruptcy is revealed to support the conclusion that this plan is an abuse of the provisions and spirit of Chapter 13 rehabilitation and has not been proposed in good faith. At trial, Carsrud testified Debtor has repeatedly harassed her at work to the point that she has obtained two protection orders against him and fears for her safety. Debtor also called his mother on her birthday threatening he would leave and never be seen again if Carsrud persisted in objecting to his bankruptcy. Considering Debtor's overall attitude about the bankruptcy process, the nature of this debt, the rela-

tionship between Debtor and creditor Carsrud, Debtor's evasive conduct in making voluntary repayments, the fact the debt would be nondischargeable under Chapter 7, the preferential activity that took place so Debtor could qualify for Chapter 13 relief, the fact Debtor repeatedly miscalculated the amount of the Carsrud judgment, the blatantly targeted relief being sought, and the fact there is no meaningful repayment proposed for the judgment convince the Court this plan is not proposed in good faith; rather, it is simply Debtor's slick scheme to shun the state court's verdict and euchre his sister from obtaining a meaningful recovery. The objections to confirmation are sustained. The Court will enter an appropriate order.

### ORDER SUSTAINING OBJECTIONS TO PLAN CONFIRMATION

In recognition of and in compliance with the letter decision entered this day regarding objections to confirming a Chapter 13 plan proposed in the above-referenced bankruptcy proceeding, it is hereby

ORDERED that the objections are sustained and plan confirmation is refused, inasmuch as an analysis of the total circumstances and facts presented indicates the plan is not proposed in good faith as required by 11 U.S.C. § 1325(a)(3).