In re Juanita Elaine BURRIS, Debtor.

Bankruptcy No. 96–44004–ABF.

United States Bankruptcy Court,
W.D. Missouri.

April 2, 1997.

Steven B. Strayer, Liberty, MO, for debtor.

Steven Petry, Kansas City, MO, for personal representative.

*MEMORANDUM OPINION*

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Elaine Burris, a Chapter 13 debtor, is the widow of Charles E. Burris ("Charles Senior"). Steven M. Petry, the Personal Representative of Charles Senior's Probate Estate (the "Probate Estate"), objects to the confirmation of Ms. Burris' Chapter 13 plan, on the ground that the plan was not filed in good

faith. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, Mr. Petry's objection to confirmation of the Chapter 13 plan is overruled. I will, therefore, enter an Order confirming the plan.

### FACTUAL BACKGROUND

Charles and Elaine Burris were married in 1978. Charles Senior had three sons from a prior marriage. He was the owner of American Service Center ("ASC"), which bought and sold recreational vehicles. Elaine Burris worked for him full-time from 1981 to 1989. By 1989 ASC was no longer profitable and did not produce sufficient income to pay Mr. and Mrs. Burris' household expenses. Ms. Burris, therefore, returned to her former profession as a registered nurse. She is presently practicing that profession at St. Lukes Northland Hospital.

Charles Senior was diagnosed with bladder cancer in May of 1991. Elaine Burris cared for him from then until his death on February 18, 1993. During that time the financial condition of ASC continued to deteriorate, and the business closed in 1992. To earn additional income, Mr. and Mrs. Burris began buying and selling horses in May of 1992. One of Mr. Burris' sons, Charles L. Burris ("Charles Junior"), worked sporadically at ASC and played some role in the horse business.

Charles Senior died intestate, and, therefore, the Clay County, Missouri Circuit Court appointed Steven M. Petry as Personal Representative of his Probate Estate. The Probate Estate is a modest one, given the failure of his business. Nevertheless, his death set off a scramble for assets, resulting in litigation among his family members which has ultimately made its way to this Court. Mr. Petry, in his capacity as Personal Representative, brought an action against both Elaine Burris and Charles Junior in the Circuit Court of Clay County, Missouri, Probate Division, (the "Probate Court") to recover assets of the Probate Estate. That action sought to recover three types of personal property: (1) a house boat owned by Charles

Senior; (2) the value of some horses sold by Charles Junior; and (3) a gun collection. The Probate Court concluded that Elaine Burris had sold the house boat for $12,000, and that she kept the net proceeds, even though title to the boat had not been properly transferred to her before Charles Senior died. Accordingly, the Probate Court entered judgment against her for $12,000. At the confirmation hearing in this Court, Ms. Burris testified that she used approximately $7,000 of the proceeds to pay for her husband's funeral, and that she used most of the remaining proceeds to pay attorneys' fees to defend the Probate Court action.

Mr. Petry also sought to recover from Charles Junior the value of certain horses he sold. While this action was pending in the Probate Court, Charles Junior died. The Probate Court's finding specifies in detail which horses had been taken by Charles Junior, to whom they had been sold, and for how much. The Probate Court rejected Charles Junior's contention that the horses had been gifted to him, because it found that the horses were owed jointly by Charles Senior and Elaine Burris, and that Ms. Burris had not consented to the gift. The Probate Court then dismissed the action against Charles Junior because it found that jointly-held property becomes an asset of Elaine Burris, and not of the Probate Estate.

Finally, Mr. Petry sought to recover a gun collection owned by Charles Senior. Apparently, the Probate Court considered evidence in the form of testimony from family members that Charles Senior regularly took firearms in trade on recreational vehicles sold by ASC. The witnesses further claimed that Charles Senior chose not to keep any records of the firearms that he received, or to account for them on the books of ASC. This same testimony was also offered at the confirmation hearing in this Court. The Probate Court then made the following findings regarding the gun collection: (1) Charles Senior owned an extensive gun collection; (2) the gun collection was stored at the residence he shared with Ms. Burris at the time of his death; (3) Charles Senior believed his gun collection was worth around $100,000; (4) he authorized the sale of some of the guns by

consignment before he died; and (5) Ms. Burris failed to account for the rest of the gun collection. Based on the evidence presented, the Probate Court found that the alleged value of the gun collection was $80,000, and, therefore, granted judgment in favor of Mr. Petry, and against Ms. Burris, for that sum. The Court found that, since the evidence established that the guns were in Charles Senior's residence at the time of his death, Elaine Burris had either concealed or disposed of the guns following his death.[1]

As a result of these findings, a judgment was entered against Elaine Burris, and in favor of Mr. Petry, in the total amount of $92,000. Ms. Burris did not appeal that judgment, and it is now a final one.[2] She did, however, file this Chapter 13 bankruptcy case to protect her assets and to prevent Mr. Petry from garnishing her wages.

At the confirmation hearing in this Court, Ms. Burris testified that she had turned over a number of guns to Mr. Petry, and that a number of other guns had indeed been on consignment at the time of Charles Senior's death and were not in her possession. She stated that the only gun in her possession is a .38 pistol, which she owns. That pistol was listed as an asset in her bankruptcy schedules.[3] She further testified that she has not sold any guns owned by Charles Senior.

Ms. Burris filed her bankruptcy petition on December 3, 1996. The proposed Chapter 13 Plan and Plan Summary, filed on December 19, 1996, requires her to pay $550 per month from future earnings to the Chapter 13 Trustee, to be disbursed to her unsecured creditors after payment of administrative expenses.[4] Schedule F of Ms. Burris' bankruptcy schedules lists total unsecured debt of $106,000, of which $92,000 represents the judgment entered by the Probate Court and $5,000 represents attorney's fees. Boatmen's First National Bank, which has a lien on the debtor's 1990 Cadillac Eldorado, has filed a claim in the amount of $1,448.75. After payment of that claim, and expenses of administration, all monies received by the trustee will go to unsecured creditors. Based on the scheduled debts, the unsecured creditors would receive between 15 and 20 percent of their claims, if all plan payments were made. In addition to the $550 per month to be paid to the trustee, Ms. Burris proposes to pay her monthly house payment of $740 outside the plan. She was current on that obligation at the time of the bankruptcy filing.

Mr. Petry objected to confirmation of Ms. Burris' plan claiming that the plan was not filed in good faith, that the plan payment as proposed is insufficient, and that the payments should be made over a longer time period. I will deal with each of these objections in turn.

## DISCUSSION

### A. Good Faith

Section 1325 of the Bankruptcy Code (the "Code"), which sets out certain requirements for confirmation of Chapter 13 plans, requires the Court to find that the Plan "has been proposed in good faith and not by any means forbidden by law."[5] The Code does not define good faith in the Chapter 13 context, probably because the term defies definition. The Sixth Circuit states that "[g]ood faith is an amorphous notion, largely defined by factual inquiry."[6] Most circuits, in fact, use a flexible "totality of the facts and circumstances" approach when analyzing good faith.[7] As a result of this totality of the

---

1. Ex. # 1, p. 11.

2. I note that under Missouri law, had she chosen to appeal the judgment of the Probate Court, Elaine Burris could have only stayed execution by posting a bond in the amount of the judgment. Mo.R.Ct. 81.09 (1997). Based on the assets listed in her bankruptcy schedules, she did not have the ability to post such bond.

3. Doc. # 6, Schedule B.

4. Doc. # 5.

5. 11 U.S.C. § 1325(a)(3).

6. *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah )*, 836 F.2d 1030, 1033 (6th Cir.1988).

7. *See, e.g., Handeen v. LeMaire (In re LeMaire)*, 898 F.2d 1346, 1353 (8th Cir.1990); *Okoreeh–Baah*, 836 F.2d at 1033 (citing *In re Chaffin*, 816 F.2d 1070, 1074 (1987), *modified on other grounds*, 836 F.2d 215 (5th Cir.1988); *In re Johnson*, 708 F.2d 865, 868 (2nd Cir.1983); *In re Kitchens*, 702 F.2d 885, 888–89 (11th Cir.1983);

circumstances approach, case law prior to 1984 developed a number of factors to guide the Court in determining whether a Chapter 13 plan had been proposed in good faith.[8] In 1984, however, Congress amended the Bankruptcy Code (the "Code") to include section 1325(b), the "disposable income" test.[9] The Eighth Circuit in *Education Assistance Corporation v. Zellner* stated that section 1325(b)'s "ability to pay," or disposable income, criteria subsume most of the factors identified in *In re Estus.*[10] A Chapter 13 plan, therefore, according to the *Zellner* Court, is proposed in good faith if the debtor commits all of her projected disposable income over a three year period to make payments under the plan,[11] and the Court finds that the debtor has accurately stated her debts and expenses; that she has made no fraudulent misrepresentations to the Court; and that she has not unfairly manipulated the Code.[12] No evidence was presented at the confirmation hearing that Ms. Burris inaccurately stated her debts and expenses, with one exception which will be discussed below. Mr. Petry does not contend that Ms. Burris made any fraudulent misrepresentations to this Court, or that she has unfairly manipulated the Code. The Sixth Circuit, in *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah )*,[13] articulated a good faith test that considers the ability to pay criteria of section 1325(b) in conjunction with criteria not subsumed in the 1984 amendments to the Code:

> The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources.[14]

Based upon that articulation of good faith, I find that Ms. Burris is willing to commit all of her available resources to repay her pre-petition debts, and that her intentions in accomplishing that goal are sincere. The Eighth Circuit, however, requires a discussion of a debtor's prepetition conduct as part of its good faith determination.

In the Eighth Circuit the leading case on good faith in Chapter 13 is *Handeen v. LeMaire (In re LeMaire).*[15] In that case the Court considered the importance of debtor's prepetition conduct in finding that the plan had not been proposed in good faith.[16] Under the guise of public policy, the *LeMaire* Court relied heavily upon the fact that LeMaire's prepetition conduct gave rise to a debt that would have been nondischargeable had he filed a Chapter 7 case.[17] The facts in *LeMaire,* however, are unique and, therefore, significant to any determination of the weight

*In re Estus,* 695 F.2d 311, 316–17 (8th Cir.1982); *Deans v. O'Donnell,* 692 F.2d 968, 972 (4th Cir. 1982); *In re Goeb,* 675 F.2d 1386, 1389–90 (9th Cir.1982); *In re Rimgale,* 669 F.2d 426, 432 (7th Cir.1982)).

8. *See, e.g., Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987) (citing *United States v. Estus (In re Estus),* 695 F.2d 311, 317 (8th Cir.1982) (the *Estus* factors are: (1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses, and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee)).

9. *Zellner,* 827 F.2d at 1227.

10. *Id.*

11. 11 U.S.C. § 1325(b)(1)(B).

12. *Zellner,* 827 F.2d at 1227.

13. 836 F.2d 1030 (6th Cir.1988).

14. *Id.,* at 1033.

15. 898 F.2d 1346 (8th Cir.1990).

16. *Id.,* at 1355–56.

17. *Id.,* at 1349.

a Court should accord prepetition conduct in its good faith analysis.

In *LeMaire,* Handeen had gone to pick up his son and found LeMaire, an acquaintance, waiting for him. When Handeen got out of his car, LeMaire shot at him nine times with a Bolt action rifle. Five of those shots struck Handeen. LeMaire, declaring that he had intended to kill Handeen, pled guilty to a charge of aggravated assault, and he was sentenced to imprisonment. Handeen brought a civil suit against LeMaire and obtained a consent judgment in the amount of $53,362.50. After being released from prison, and obtaining employment, LeMaire filed a Chapter 13 case and proposed to pay approximately 42 percent of the unsecured claims, consisting principally of the claim due Handeen.[18] The Court found that there was no question that LeMaire's assault inflicted a "willful and malicious" injury upon Handeen, and that the obligation due him would have, therefore, not been dischargeable in a Chapter 7 proceeding.[19] The Eighth Circuit pointed out that Section 523(a)(6) is not applicable in Chapter 13 cases; thus, debts for willful and malicious injury are dischargeable in Chapter 13, if all payments are made under a confirmed plan. The Court found that a Chapter 13 plan may be confirmed despite the most egregious pre-petition conduct, if other factors suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims. However, the Court stressed the relevance of pre-petition conduct in any determination of good faith. In *LeMaire,* based on the heinous nature of the crime committed by the debtor, the Court found a strong public policy against allowing discharge of the obligation based on the payments proposed.[20] However, the *LeMaire* decision was expressly limited to the facts of that particular case:

> Our decision should not be read as a broad declaration extending beyond the facts before us. We simply hold that the circumstances surrounding this particular debt

reveal that *LeMaire* did not demonstrate the requisite good faith to seek Chapter 13 protection and that refusing to discharge this particular debt, because of his lack of good faith, is consistent with the policies which the Bankruptcy Code seeks to advance.[21]

In a dissent joined by two other judges, Judge Magill pointed out that the Code only requires that the plan itself be in good faith, not that the debt have been incurred in good faith.[22] The dissent would have held that LeMaire had made a "wholehearted attempt to pay Handeen as much as he was able," [23] and that the plan had, therefore, been filed in good faith. In effect, the dissent argued that in determining whether the plan was filed in good faith, the Court should not be swayed by the nature of the conduct involved, but should instead look to whether the debtor is using his best efforts to satisfy the obligation.

The *LeMaire* Court began with the presumption that the debtor's conduct gave rise to a debt that would not have been dischargeable in a Chapter 7 case. That finding, however, was not sufficient to prevent the debtor from using Chapter 13. Instead, it was the heinous nature of debtor's crime, combined with the nondischargeability under Chapter 7, that swayed the Court.

█ In this case no finding has been made that Ms. Burris' conduct, which gave rise to the judgment debt, was willful and malicious. Nor has any finding been made that the obligation would be nondischargeable in Chapter 7. The Probate Court found that Ms. Burris attempted to have Charles Senior transfer title to a house boat to her while she was administering morphine to him as his nurse in order to control his pain. After his death, she sold the boat, and did not turn over the $12,000 in net proceeds to Mr. Petry. The Probate Court also found that Ms. Burris either concealed or disposed of certain guns following Charles Senior's death.

---

18. *See generally Id.,* at 1347.

19. 11 U.S.C. § 523(a)(6).

20. *See generally, LeMaire,* 898 F.2d at 1348.

21. 898 F.2d at 1353.

22. *Id.,* at 1357 (Magill, J., dissenting).

23. *Id.,* at 1355.

There is no evidence in the record presented to this Court to support a finding that she acted willfully and maliciously. Indeed, no one contends her conduct approaches the criminal conduct condemned by the Circuit Court in *LeMaire*.

Rather, in support of his contention of bad faith, Mr. Petry points out the following: (1) a year or so following her husband's death, Ms. Burris purchased a set of diamond earrings for $2,000; (2) soon after her husband's death in 1993, she made a $5,000 down payment on a 1990 used Cadillac; (3) she made a trip to Dallas with her mother, and another trip to Las Vegas with some co-workers; (4) soon after her husband's death she made a loan to one Don Knoll in the amount of either $2,000 or $2,500; and (5) she has made no effort to collect the value of the horses allegedly taken by Charles Junior. The Probate Court relied on these factors in concluding that Ms. Burris had hidden or sold her husband's gun collection. Here, Mr. Petry uses these same factors in his attempt to show that Ms. Burris filed her plan in bad faith. Mr. Petry also apparently attempts to show that Ms. Burris lives extravagantly, and that such "extravagance" is an indication that she made off with her husband's assets. Indeed, Mr. Petry pointed out that Ms. Burris had told a hospice worker, after her husband's death, that she was financially better off than she had ever been before.

In response, Ms. Burris stated that she has continued to enjoy a good income since her husband's death, with less ongoing expenses than when he was ill. Out of that income, she was able to purchase items such as the earrings. She claims she obtained the $5,000 for the down payment on the used Cadillac by cashing in an IRA. She testified that she bought the Cadillac because, at the time of her husband's death, she was uncertain whether she would ultimately gain title to the Blazer owned by him, and driven by her. She needed a car to get to work, so she purchased one. The evidence indicates that the trips to Dallas and Las Vegas were not costly, and they were well within her budget. As to the loan to Don Knoll, Ms. Burris does not deny that she had a relationship with Mr.

Knoll, and that she loaned him some money. The relationship began soon after Charles Senior's death, ended quickly thereafter, and Mr. Knoll has never repaid the loan. While her hastiness in establishing a relationship with Mr. Knoll may have been unwise, and loaning him money may have been foolish, neither act indicates willful and malicious conduct, especially in light of the egregious conduct the Court found willful and malicious in *LeMaire*.

Finally, as to the horses allegedly taken by Charles Junior, Mr. Petry seems to contend that Ms. Burris' failure to pursue the value of the horses shows that she didn't need that money because she had plundered the assets of Charles Senior. She testified at the confirmation hearing, however, that there was no point in pursuing the value of the horses from Charles Junior's estate, as it had no assets with which to honor any debt found to exist.

The Probate Court made no finding of willful and malicious conduct in rendering its judgment against Ms. Burris. And Mr. Petry offered no evidence at the confirmation hearing to support such a finding. Thus, I find that Ms. Burris' prepetition conduct was not willful and malicious, nor is it in any way analogous to the criminal conduct considered in *LeMaire*. Moreover, the strong public policy against discharging debts arising out of crimes such as that committed by LeMaire is not implicated here.

■ In addition to these general policy arguments, Mr. Petry argues that the monthly payment of $550 per month is insufficient. As part of a good faith finding, the Court must determine if a debtor has accurately stated her income, debts, and expenses.[24] The monthly payment provided for in the plan is derived from that accurate statement, therefore, I will now deal with that issue.

### B.  Sufficiency of Payment

■ Section 1325(b) of the Code requires a Chapter 13 debtor to contribute all of her disposable income to make the payments under her plan:

---

**24.** *Education Assistance Corp. v. Zellner*, 827   F.2d 1222, 1227 (8th Cir.1987).

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

. . . . .

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor;[25]

Ms. Burris' bankruptcy Schedules show gross monthly income of $4,179.96, and net monthly take-home pay of $2,865.74. Her expenses include a home mortgage payment of $740. She shows total monthly expenses of $2,315, including the mortgage payment and a home maintenance expense of $442. Her projected disposable income is, therefore, $550.74 per month. Hence, her proposed payment of $550 per month for three years appears to comply with section 1325(b). The Code, however, defines disposable income as the income that remains to be spent by a debtor after deducting the expenses reasonably necessary for debtor's maintenance or support.[26] The Court must, therefore, find that debtor's expenses are not only accurate, but "reasonably necessary."[27] Mr. Petry objects to the proposed expense for home maintenance of $442 per month as not reasonably necessary.

■ Ms. Burris' bankruptcy schedules indicate her home has a value of $72,500, and mortgage debt of $60,000. It is the home in which she resided with her husband. She

testified, without contradiction, that the property is in a deteriorating condition because her husband was financially unable to make necessary repairs. She stated that she will need to spend $15,850 to make those repairs in order to continue to live in the home. The $442 allowance for maintenance expense, assumes that those repairs will be made over a period of three years. The bankruptcy court in *In re Jackson* permitted a Chapter 13 debtor to make certain needed repairs to the residence finding such repairs were necessary to "prevent damage to collateral (which is often subject to a lien) as well as preserve the safety and well-being of the debtor and family."[28] I agree. I find the repairs proposed by Ms. Burris are reasonably necessary to prevent further damage to her home and to permit her to safely continue to live in her home. Thus, I find that the home maintenance expense is justified. As such, I find that the plan complies with section 1325(b).

Finally, Mr. Petry contends that, if the plan had been proposed in good faith, Ms. Burris would have proposed that the plan payments continue beyond the period of thirty-six months. I will now deal with this final argument.

## C. Payment Period

■ Section 1322(d) of the Code very precisely establishes the payment period for Chapter 13 plans: "the plan may not provide for payments over a period that is longer than three years unless the Court, for cause, approves a longer period, but the Court may not approve a period that is longer than five years".[29] Not only do most Chapter 13 debtors propose plan payments over 36 months, the Code prefers such a term.[30] Chapter 13 was designed for the voluntary repayment of debts from future income, therefore, to require debtors to make payments for more

25. 11 U.S.C. § 1325(b).

26. 11 U.S.C. § 1325(b)(2)(A).

27. *Handeen v. LeMaire (In re LeMaire)*, 883 F.2d 1373, 1380 (1989), *rev'd on other grounds*, 898 F.2d 1346 (8th Cir.1990); *In re Jackson*, 173 B.R. 168, 171 (Bankr.E.D.Mo.1994); *In re Gibson*, 142 B.R. 879, 882 (Bankr.E.D.Mo.1992).

28. 173 B.R. 168, 171 (Bankr.E.D.Mo.1994).

29. 11 U.S.C. § 1322(d).

30. *Washington Student Loan Guaranty Ass'n v. Porter (In re Porter)*, 102 B.R. 773, 777–78 (9th Cir. BAP 1989).

than three years is "tantamount to involuntary servitude."[31] Plan payments over a period in excess of 36 months can only be approved for cause, and it is the debtor's burden to show that cause exists.[32] The majority of courts that have discussed this issue have found that the debtor must voluntarily choose to extend the payment terms beyond 36 months.[33] Such a request should be denied unless it is in the best interest of the debtor, therefore, Mr. Petry cannot impose an extension upon Ms. Burris.[34]

■ Chapter 13 debtors usually propose a plan with payments beyond three years in order to cure a default on a home mortgage, retire an otherwise nondischargeable obligation, such as student loans or child support, or pay a priority claim.[35] None of those reasons apply in this case. The *Porter* court held that the Code requires that Chapter 13 debtors dedicate all disposable income to the plan for three years, and no more.[36] I have already found that Ms. Burris proposed her plan in good faith, and that she is committing all of her disposable income to make her plan payments. Mr. Petry, therefore, has no standing to require that she extend her plan payments beyond the 36 months required by sections 1322(c) and 1325(b) of the Code.

For all of the above reasons, I OVERRULE Mr. Petry's objection to confirmation of Ms. Burris' Amended Chapter 13 Plan. There are no other objections to confirmation before the Court, therefore, the Amended Chapter 13 plan will be CONFIRMED as proposed. An Order in accordance with this Memorandum Opinion will be entered this date.

---

**31.** *Id.,* at 777 (citations omitted); **The Honorable Keith M. Lunden, Chapter 13 Bankruptcy** § 4.77 at 4–139 (1992).

**32.** **Lunden** at § 4.79; *In re Minor,* 16 B.R. 147, 148 (Bankr.S.D.Ohio 1981).

**33.** *Porter,* 102 B.R. at 777.

**34.** *Washington Student Loan Guaranty Ass'n v. Porter (In re Porter),* 102 B.R. 773, 777–78 (9th Cir. BAP 1989).

**35.** **8 Collier on Bankruptcy** ¶ 1322.17[1] at 1322–52 (Lawrence P. King, et al. eds., 15th ed. 1996).

**36.** 102 B.R. at 777–78.