**In re Christopher Lynn ALLEN, d/b/a Christopher Lynn Allen, Debtor.**

**Bankruptcy No. 99–10412–13.**

United States Bankruptcy Court,
D. Montana,
Butte Division.

Dec. 3, 1999.

---

James A. Patten, West, Patten, Bekke-dahl, & Green, P.L.L.C., Billings, MT, for debtor.

Brian M. Fryer, Law Offices of Brian M. Fryer, Indio, CA, for creditor.

Robert G. Drummond, Great Falls, MT, Chapter 13 Trustee.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 13 case, hearing was held by video-conferencing on November

4, 1999, on confirmation of Debtor's First Amended Chapter 13 Plan and Debtor's objections to proofs of claims 6, 7, 8, 9, 10 and 12 filed by creditor Jacqueline Allen, together with objections to confirmation filed by the Chapter 13 Trustee and Jacqueline Allen. Present at the hearing were the Debtor and his counsel, James A. Patten, the objecting creditor, Jacqueline Allen, her counsel, Brian M. Fryer, and the Chapter 13 Trustee, Robert G. Drummond.[1] Post-hearing memorandum have been filed by the Debtor and Jacqueline Allen. All memorandum have been considered by the Court in making this decision. Since the feasibility of Debtor's Plan is directly related to the objections to the priority claims filed by Jacqueline Allen, the Court will first consider the objections to claims.

## A.   OBJECTIONS TO PROOFS OF CLAIM.

### 1.   Proof of Claim No. 6.

█ Jacqueline Allen ("Jacqueline") claims the Debtor is indebted to her in the sum of $3,025,000.00, which includes as a priority component, the sum of $250,000 for uninsured health costs under 11 U.S.C. § 507(a)(7). The entire claim is based on an unliquidated, contingent liability which is the basis of a legal action pending between the parties in the California Superior Court, County of Riverside, Indio Branch, Case No. INC 001476. The Court has previously granted Jacqueline's motion for relief from the stay to pursue this tort action (Order of July 22, 1999). The claim is based on an alleged assault and battery committed by the Debtor while the parties were married. The parties are now divorced as represented by Exhibit "A", a copy of the Decree of Dissolution entered in California. Jacqueline contends the medical portion of the claim is a priority debt under 11 U.S.C. § 507(a)(7)(B) for support and maintenance of an ex-spouse. However, Exhibit "A", originally entered

December 23, 1998 (amended May 26 and June 2, 1999) specifically grants to Jacqueline spousal support in the sum of $4,500 per month beginning October 5, 1998, plus 35% of Debtor's gross income earned over $156,000 per year. That is the only spousal award in the Decree, which binds both parties. Section 507(a)(7) specifically requires that for any spousal award to have priority status, the allowed claim must be based on a separation agreement, divorce decree or other order of a court of record. Absent any award for payment of medical expenses to Jacqueline in the Divorce Decree, the claimed medical expenses are not entitled to priority status and the Debtor's objections to that portion of the claim are sustained.

### 2.   Proof of Claim No. 7.

█ Proof of Claim No. 7 filed by Jacqueline asserts an unsecured priority claim in the amount of $51,761.50 based on 11 U.S.C. § 507(a)(4). The claim also seeks allowance as a secured claim. This claim is based on contributions to an employee benefit plan, specifically being one-half of Debtor's IRA and Profit Sharing plan, as the creditor's community property share in the Debtor's retirement accounts.

Again, Exhibit "A", the Divorce Decree, settled all community property interests between the parties. Paragraph 12 of that Decree grants to the Debtor all interest in the IRA at Prudential Securities with a value of $16,261 as a division of the community property, and Paragraph 13 grants to the Debtor solely all interest in the Profit Sharing account at Prudential Securities in the amount of $86,462, as a division of the community property acquired during the marriage. The total of these accounts is $102,723, so that Proof of Claim No. 7 is one-half of that sum or $51,361.50.

---

**1.**  The Debtor and Jacqueline Allen testified and Debtor's Exhibits A–G were admitted into evidence without objection, as were all Exhib-

its attached to Jacqueline Allen's proof of claim no. 6.

Section 507(a)(4) allows priority status for unsecured claims for contributions to an employee benefit plan:

(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only—

(B) for each such plan, to the extent of—

(i) the number of employees covered by each such plan multiplied by $4,300; less

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

The evidence shows Jacqueline was formally an employee of the Debtor's professional corporation, as was the Debtor, and the corporation contributed to the IRA and profit sharing plans over the years. Jacqueline left her employment on April 15, 1996, when the parties separated, and while the Debtor could not testify as to the date the professional corporation ceased business, the income tax returns, Exhibits "B" and "C", show that Debtor was conducting his medical practice as Christopher L. Allen, D.O., a professional corporation, into the spring of 1998, when he then took employment at St. Vincent's Hospital in Billings, Montana. Consequently, not only have the contributions and assets to the retirement employee benefit plans been divided by the California State Court Divorce Decree in favor of the Debtor, leaving Jacqueline with no interest in such funds, but also, there were no contributions made within 180 days of the bankruptcy petition date or within 180 days of the cessation of the business. Jacqueline's assertion that the contributions became due when the Divorce Decree was entered is without merit and directly contrary to the provisions of the state court order.

Further, Jacqueline has shown no secured interest in the plans which would grant her a secured claim. Thus, Debtor's objection to Proof of Claim No. 7 is sustained and the claim is denied allowance in full.

3. Proofs of Claim Nos. 8, 10 and 12.

■ Proof of Claim No. 8, as amended by Proof of Claim Nos. 10 and 12, seeks priority status in the sum of $10,335.60 plus 35% of Debtor's income in excess of $156,000 from September 18, 1998. According to Jacqueline's testimony, she asserts the Debtor's salary at St. Vincent's Hospital, plus bonuses brings the Debtor's compensation in excess of $156,000. The proofs of claims assert unpaid alimony of $10,335.60 for arrearages from September of 1998 through June 6, 1999. The Decree of Dissolution provides for support obligations commencing October 1998, in the sum of $4,500 per month. Exhibit "A", paragraph 45.

At the hearing, Debtor testified he was current on all support payments as each payment of $4,500 is paid directly by St. Vincent's Hospital to Jacqueline pursuant to a wage assignment order. The only issue is whether certain payments for reimbursement of moving expenses or bonuses are to be included as compensation. The evidence clearly reflects Debtor's compensation for 1998 from St. Vincent's Hospital was less than $156,000, Exhibit "6" (W–2 Statement—$99,869.00).[2] Debtor, on cross-examination, admitted receiving bo-

---

**2.** Exhibit "E", Debtor's 1998 tax return shows gross income of $168,630, which includes wages of $99,869 and business income of $63,743 and rents of $5,005. The Divorce Decree specifically limits the 35% portion of the spousal award to Debtor's gross income earned over and above $156,000 per year and the 35% extra income does not include capital gains, income from hobbies, buying and selling assets or trading on the stock market but "[T]he additional spousal support only includes earned income from his services as a doctor." The only evidence in the record is that in 1998 the Debtor earned income as a doctor from St. Vincent's Hospital.

nuses from St. Vincent's Hospital in December 1998, of $7,000, February 1999, of $2,200 and April 1999, of $10,500, but these bonuses are then reconciled under the contract productivity pay process, so that by September 30, 1999, the total bonus due was a negative sum of $1,774. Exhibit "G".

In sum, Jacqueline has failed to show by a preponderance of the evidence that any sum over the $4,500 per month for 1998 and 1999 are due under the Divorce Decree. Accordingly, Debtor's objection to Proof of Claim No. 12, amending Proof of Claim Nos. 8 and 10, is sustained, and the proofs of claim are denied allowance in full.

4. Proof of Claim No. 9.

■ Proof of Claim No. 9 asserts an amount due of $4,300 as a wage priority claim under 11 U.S.C. § 507(a)(3) for services performed from March 15, 1996, to April 15, 1996. The addendum to the claim asserts Jacqueline had past due wages due from Debtor at a "minimum" of $4,300 earned within 90 days of the cessation of Debtor's business.

Section 507(a)(3) provides for priority status to "allowed unsecured claims, but only to the extent of $4,300 for each individual or corporation, as the case may be, earned within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for—(A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual[.]" As noted above, the Debtor operated a professional corporation, and was employed by the professional corporation. Any wages due any employee would be due from the corporation which is not a debtor in this case. In addition, Jacqueline concedes she left whatever work she was doing for the corporation (or the Debtor, if that be the case) on April 15, 1996. Yet, the corporation and the Debtor continued in business into 1998, being more than 90 days passed the date the wages are claimed due. Moreover, it is clear

Jacqueline never worked or earned wages from the Debtor individually within 90 days of the petition date. The claim is false as filed. A review of the attachments to Proof of Claim No. 9 show Jacqueline asserts she was "corporate secretary and the debtor's bookkeeper and business manager managing the operation and running of his $400,000.00 a year corporation ... for over ten years from 1987–1996 ...." The attachments also assert she was a covered corporate employee for Worker's Compensation. Thus, the claim is solely against the corporation. Exhibit "A" shows the corporation was awarded to Debtor and the state court found it has no value. Notably, the Divorce Decree does not mention the wage claim as part of the division of the community property, so it can be safely assumed the claim was never pressed in the divorce case, but has only recently been resurrected after the bankruptcy filing. Accordingly, the objection to this Proof of Claim is sustained and the claim is denied allowance.

**B. CONFIRMATION OF THE FIRST AMENDED CHAPTER 13 PLAN.**

Debtor's First Amended Chapter 13 Plan ("Plan") filed August 3, 1999, provides for plan payments in the sum of $1,124.00 each month until August 1999 and the sum of $1,248 each month thereafter until the Plan is completed in 60 months. The Plan does not list any secured claims but provides the trustee shall pay all claims entitled to priority under § 507 of the Bankruptcy Code. The Plan provides for distributions of at least $66,899.40 based on a liquidation analysis if the Debtor's estate were liquidated under Chapter 7 of the Bankruptcy Code. The Plan also provides that Debtor shall commit all projected disposable income to the Plan and shall report any changes in income to the Chapter 13 Trustee ("Trustee"). Thus, Debtor's Plan will require total plan payments of $74,136.00.

■ Debtor's schedules list unsecured priority claims of $66,899.40 and unsecured

claims of $74,913.87. The priority claims are for income taxes due the IRS and State of California. The IRS filed a proof of claim listing a priority claim of $55,-784.30 and the State of California has failed to file a claim. The bar date for filing proofs of claim by governmental units was August 23, 1999, so the State of California is now barred from filing a claim to participate in distribution under the plan. *In re Quesnell,* 18 Mont. —— (Bankr.Mont.1999); F.R.B.P. 3002(c); *In re Edelman,* 237 B.R. 146 (9th Cir. BAP 1999). The penalty for not filing a timely proof of claim is that the claim will not be allowed. *In re Quesnell, supra.*

The Debtor's schedules "I" and "J", as amended, show monthly income of $12,-240.00, with take home pay of $4,056.30 (payroll deductions include $4,500 for spousal maintenance) and expenses of $2,805.00, for net income available to the plan of $1,251.00.[3]

■ The Trustee's objection to the Plan includes the issue as to payments of priority claims to Jacqueline, which, if allowed, would make the Plan not feasible. Since these priority claims have now been rejected, the Trustee's objection on that ground is without merit. Second, the Trustee raises the issue as to Debtor's eligibility to file under Chapter 13 due to Proof of Claim No. 6, discussed above. That claim is clearly unliquidated and contingent and thus cannot be factored in the eligibility criteria of 11 U.S.C. § 109(e). Thus, this objection is without merit. Finally, the Trustee contends Debtor's disposable income is uncertain and questions whether Debtor is committing 100% of his projected income to the plan. Such inquiries, however, depend upon whether Debtor's projected income will change with his disability income. This income involves the Debtor's employment status at St. Vincent's Hospital. The Hospital presently seeks relief from the automatic stay in

order to give Debtor a termination notice from his employment. The motion is contested. Nevertheless, Debtor testified that Debtor's medical condition presently places the Debtor in a position to apply for disability insurance benefits under two insurance policies now in full force and effect. Those applications are pending and if the applications are granted, the disability payments will provide adequate income to fund the plan in the same amount as Debtor's present hospital income. Furthermore, under the hospital contract, the notice of termination, if allowed, requires a 120 day notice, so Debtor's income is at least secure for a period of time to await the decision on the disability income application. I find such objection, therefore, not an obstacle to confirmation, particularly since the Debtor, Trustee or holder of an allowed secured claim may request modification under § 1329 upon any change in circumstances.

■ Jacqueline's objections are made on several grounds, which are discussed in her memorandum in opposition to confirmation and include four bases, namely (1) income ineligibility, (2) failure to apply all disposable income to the plan, (3) failure to provide full value of claims and (4) for claims exceeding the statutory limit under 11 U.S.C. § 109(e). The latter objection to statutory ineligibility under § 109(e) is based on the same objection to eligibility made by the Trustee and rejected above by this Order. Included in such objection by Jacqueline is that the size of the unliquidated claim gives rise to a bad faith objection, citing *Handeen v. LeMaire, (In re LeMaire),* 898 F.2d 1346 (8th Cir.1990).

*Le Maire* decided two issues. First, the Eight Circuit Court of Appeals held that the debt incurred from a willful and malicious act was dischargeable in a Chapter 13 case. *Id.* at 1348. That may or may not be the same result in the case *sub*

---

**3.** The amended schedule "J" shows the amount to be paid into the plan is $5,751.30 per month, but that schedule fails to reflect the $4,500 monthly spousal award to Jacqueline.

*judice,* but that issue is simply not ripe. Second, *Le Maire,* discussing whether the Chapter 13 plan was proposed in good faith under § 1325(a)(3), adopted the totality of the circumstances criteria, citing *United States v. Estus (In re Estus),* 695 F.2d 311, 316 (8th Cir.1982). The majority opinion of the court discussed the evidence and concluded that fact specific circumstances required a reversal of the bankruptcy court's finding that the plan was proposed in good faith. The Ninth Circuit Court of Appeals has also adopted the "totality of the circumstances" test. *Goeb v. Heid (In re Goeb),* 675 F.2d 1386, 1390 (9th Cir.1982); *Downey Sav. And Loan Ass'n v. Metz (In re Metz),* 820 F.2d 1495, 1498 (9th Cir.1987). *See also, State of Oregon, Higher Educ. Assistance Found. v. Selden (In re Selden),* 121 B.R. 59 (D.Or.1990) (holding that once the bankruptcy court finds that debtor meets the requirements of section 1325(b), the fact that the plan results in a low percentage repayment is not relevant in assessing the good faith of the Chapter 13 plan). Moreover, *Street v. Lawson (In re Lawson),* 55 B.R. 763 (9th Cir. BAP 1985) holds that discharge of a debt that would be non-dischargeable in Chapter 7 is only one factor to consider in the good faith issue.

In this case, I find the Plan is proposed in good faith. All of Debtor's projected disposable income based on present employment is committed to the Plan. The Debtor seeks repayment under the Plan of a substantial tax claim and obviously wishes to avoid the future litigation expense of Jacqueline's suit in California. The Divorce Decree has not been accepted by Jacqueline, as she still seeks more litigation to continue that acrimonious fight. Substantial payments are being made under the plan, mostly to the benefit of the IRS and one other unsecured priority creditor, James Cigalese, Jacqueline's divorce counsel, in the sum of $10,000.00. Under all of the circumstances, I find the Plan is proposed in good faith.

■ As for the argument of Jacqueline that once her tort claim is liquidated, Debtor could never be eligible for Chapter 13, such argument ignores two factors. First, the Debtor disputes the underlying assault claim and even Jacqueline's claim for damages shows actual present medical costs incurred of $30,000.00 with the claim then raised to $250,000.00 for future psychiatric counseling for emotional distress. Second, the petition date governs the eligibility requirements, not some uncertain future date when a lawsuit may ripen into judgment of a now unknown amount. *Leppaluoto v. Combs (In re Combs),* 101 B.R. 609, 614 (9th Cir. BAP 1989) ("Congress intended the bankruptcy filing date to be the guidepost in establishing a person's rights in bankruptcy.") (quoting *Heldt v. State of South Dakota,* 17 B.R. 519, 521 (Bankr.D.S.D.1982)). This issue is settled by *Slack v. Wilshire Ins. Co. (In re Slack),* 187 F.3d 1070 (9th Cir.1999), which holds the language of § 109(e) states "the amount of the debt is determined as of 'the date of the filing of the petition.'" *Slack* furthers holds that the disputed debt must be "readily ascertainable" as to amount and "[t]he definition of 'ready determination' turns on the distinction between a simple hearing to determine the amount of a certain debt, and an extensive and contested evidentiary hearing in which substantial evidence may be necessary to establish amounts or liability." *Id.* at 1073–74, quoting *In re Wenberg,* 94 B.R. at 634. Clearly, it would take days of testimony and evidence to establish not only liability but a sum certain, so the test of readily ascertainable simply cannot be met in this case.

The first objection by Jacqueline is that Debtor's pending termination from his current employment makes the Debtor ineligible because he will no longer have regular income to fund the Plan. This income issue was discussed above under the Trustee's objection and rejected on the facts.

The second objection is that Debtor is not committing all of his disposable income to the Plan, particularly his quarterly bonuses earned from his employer. This factual matter was also discussed above and this Court again concludes the bonus arrangement with the hospital shows a negative balance after applying the contract productivity provision. The argument thus lacks factual basis and is rejected.

■ The third objection is that Debtor proposed a "zero-payment" plan to the claim of Jacqueline, and such plans are disfavored by the courts. This again goes to the good faith/bad faith argument and *Selden, supra,* rejects the argument. As long as Debtor's Plan meets the good faith criteria set forth in *Goeb* and *Metz* and the disposable income test under § 1325(b)(1), the fact that substantial priority claims must be paid before general unsecured claims, thus leaving the unsecured claims with little or no payment, is of no importance and the Plan passes good faith muster. The argument that Debtor, to be eligible for Chapter 13 relief, must pay 70% to 100% of a disputed unliquidated claim, the amount of which is fixed solely by the creditor's allegations, would defeat any legitimate Chapter 13 relief to an honest debtor. For example, in *In re Cregut,* 69 B.R. 21 (Bankr.D.Ariz.1986) the court found bad faith under circumstances where the debtor filed the petition to avoid potential liquidation of a non-dischargeable tort claim. The debtor lacked a source of regular income and the only scheduled debt, other than the unliquidated tort claim, was restitution payment to debtor's father. In *Cregut,* the debtor college student, who lacked a regular source of income, proposed to pay $100 per month for 60 months with only gifts from his father, and thus, the debtor's plan lacked good faith. The circumstances in this case as discussed above are vitally different. Rather, the holding of *In re Harmon,* 72 B.R. 458 (Bankr.E.D.Pa.1987) is more applicable. In that case, the court found that a 0% payment plan was proposed in good faith where the debtor proposed to pay secured claim holders in full (as priority claims are paid in full in this case), the debtor was working a second job and was providing for three children. Here, Debtor is working in his profession and providing substantial spousal maintenance to Jacqueline as part of his Plan.

■ Proofs of allowed claims timely filed by creditors show that unsecured priority claims total $65,784.30 and liquidated general unsecured claims total $53,001.71 excluding Proof of Claim No. 6. The total plan payments are projected in the sum of $74,136.00. After deducting the Trustee's fee of 10% ($7,413), the balance to pay administrative expenses and unsecured priority claims is $66,723.00. No application has been filed or included in the Plan for Debtor's attorney's fees. The unsecured priority claims must be paid in full under § 1322(a)(2), but are not entitled to post-petition interest. *In re Ridgley,* 81 B.R. 65 (Bankr.Or.1987); *In re Hageman,* 108 B.R. 1016 (Bankr.N.D.Iowa 1989). After payment of the priority claims, the estate would have a balance of $938.70 to pay Debtor's attorney fee or general unsecured claims. It is fair to assume that Debtor's attorney will be entitled to the $938.70 under Mont.L.B.R.2016–1. Thus, the Plan will not permit any payments to the unsecured class. For that reason, it is not necessary to estimate the amount for purposes of Plan distributions of the unliquidated, contingent tort claim of Jacqueline (Proof of Claim No. 6). Suffice it to say that Proof of Claim No. 6 is allowable as a general unsecured claim and is included in that class to be subject to discharge upon completion of Debtor's Plan.

In sum, to apply *Goeb* and *Metz,* this is Debtor's first bankruptcy filing and the Debtor has voluntarily extended the plan 60 months. The Debtor is regularly employed and is committing all disposable income under the plan. The expenses of the Debtor are ordinary and necessary and there is no burden on administration of the

estate. I therefore conclude from the above findings of fact that the First Amended Chapter 13 plan complies with each provision of § 1325(a) and (b). Accordingly, the Court shall issue a separate order confirming the First Amended Chapter 13 plan. The sole factor against a good faith finding is the Debtor's potential discharge of a non-dischargeable debt, which at this time is unproven, unliquidated and contingent. I conclude the totality of the circumstances factors set forth in *Estus, Goeb* and *Metz* are satisfied as to good faith.

Finally, the Chapter 13 Plan commits the future income and other income of Debtor to the supervision and control of the Trustee as necessary for execution of the Plan. This Plan provision complies with § 1327(b) of the Code, which provides "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor." By virtue of committing all future income to the Plan, property and future earnings of the Debtor necessary to "fulfillment" of the Plan remain property of the estate after confirmation. *Security Bank of Marshalltown v. Neiman (In re Brown)*, 1 F.3d 687 (8th Cir.1993). The confirmation order shall include a provision that all future income of the Debtor from whatever source is necessary for completion of the Plan and thus is property of the estate, and does not vest in the Debtor post-confirmation.

### C. MOTION OF JACQUELINE ALLEN FOR RELIEF FROM THE AUTOMATIC STAY.

Unsecured creditor Jacqueline Allen has filed a second motion for relief of the automatic stay. The Court has previously granted the first motion for relief from the stay to allow for the prosecution of the tort action in California Federal Court. That action will by necessity cause expense to Debtor. This pending motion for relief of the stay arises out of the Divorce Decree. Exhibit "A". The motion states that Jacqueline desires to proceed further to complete her appeal of the Decree entered December 23, 1999. Further, Jacqueline seeks relief to again enter the California Riverside County Family Law Superior Court to seek "extraordinary uninsured health costs stemming from her long-term marriage with the Debtor." The attachment to the motion, Exhibit "C", specifies the request would include terminating the existing spousal maintenance award, the IRA/Profit Sharing plan award and seek award of extraordinary health costs from Debtor's assault, plus attorney's fees and costs. In addition, Jacqueline requests "Determination of unpaid spousal support that respondent [Debtor] owes to this petitioner for respondent's employment with St. Vincent's Hospital, Montana, during all of the Summer of 1998 and for unpaid support of 35% of Bonuses paid to respondent from St. Vincent's Hospital from September 20, 1998, to present date." The motion and supporting exhibits do not show the date the modification application was filed, but it seeks to modify the order filed May 26, 1999, so it is assumed the petition was filed after that date. The Debtor's bankruptcy petition was filed February 24, 1999, and Jacqueline had notice of the filing by mailing of the § 341 first meeting of creditors notice to her on March 19, 1999. Indeed, Jacqueline's first appearance in the bankruptcy case was on May 6, 1999, by application of Brian M. Fryer's motion to appear Pro Hac Vice on her behalf. In a brief memorandum in support of the motion, Jacqueline cites *In re MacDonald*, 755 F.2d 715 (9th Cir.1985) and *In re Siragusa*, 27 F.3d 406 (9th Cir.1994) for the holding that bankruptcy courts should ordinarily avoid intrusions into family law matters and give deference to state court family law matters on the basis of comity.

Debtor's objection to the motion states that Jacqueline's continuing litigious actions in the California Family Law Courts are an attempt to frustrate the Debtor's relief under Chapter 13 since continuation of that litigation (which commenced on

April 8, 1996—Exhibit "A") with its attendant exorbitant expenses and drain upon the Debtor's finances is an attempt to further reduce Debtor's available income through increases in spousal maintenance and alimony obligations. The objection continues that "Jacqueline Allen's actions to date in the bankruptcy case have demonstrated that she is litigious and the motion to modify stay is a continuation of her litigious activities" and "would impose an unnecessary hardship on the Debtor."

It is well established that the purpose of the automatic stay under § 362(a) is to provide the debtor with relief from the pressures and harassment of creditors seeking to collect their claims and prevent the dismemberment of a debtor's assets by individual creditors so as to promote the bankruptcy goal of equality of distribution. The automatic stay is one of the fundamental debtor protections provided by the Code since it permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy. 3 COLLIER ON BANKRUPTCY, ¶ 362.03, pp. 362–13, 14 (15th Ed.).

The automatic stay provides for stay of litigation against the debtor that was commenced prior to the commencement of the bankruptcy case, and stays the continuation of that litigation, including family court actions involving divorces or child custody, even if it appears that they will have little impact on a debtor's financial condition. *Id.* at pp. 362–15. Thus, relief from the stay must be first granted before any creditor may begin or continue litigation. Actions taken in violation of the stay are void. *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569 (9th Cir.1992). Relief from the automatic stay must be granted only upon a showing of cause. 11 U.S.C. § 362(d)(1).

Section 362(b)(2) excepts from the automatic stay the collection of alimony, maintenance or support payments from property that is not property of the estate

and continuation of actions to modify an order for support. But § 362(b)(2) does not extend to the continuation of an action to enforce an obligation. COLLIER, *supra,* p. 362–5. In Chapter 13, § 1306(a) defines property of the estate to include all property of the kind specified in § 541 of the Bankruptcy Code that is acquired by the debtor after the commencement of the case. As COLLIER notes at ¶ 362.05[2], p. 362–51:

> Although section 1327 provides that property of the estate may revest in the debtor upon confirmation, the confirmation order may provide otherwise. If it does not, Section 362(b)(2)(B) has "little or no practical effect in Chapter 13 situations." [*Carver v. Carver,* 954 F.2d 1573, 1577 (11th Cir.1992); *In re Pacana,* 125 B.R. 19 (9th Cir. BAP 1991)] Moreover, to the extent that a Chapter 13 plan provides for an alimony, support or maintenance claim, the property revests in the debtor free and clear of that claim.

Conceding, as we must, that *MacDonald* and *Siragusa, supra,* establish the principle that bankruptcy courts should ordinarily not interfere with domestic relation disputes which do not have an adverse impact on the bankruptcy case, that doctrine simply cannot be applied under the facts of this case. As to the request to allow continuation of the post-petition modification of the Divorce Decree, that petition is void under the holding of *Schwartz, supra,* and cannot be continued. In short, it should never have been filed without seeking relief from the stay. Moreover, seeking modification of property settlement rights not in the nature of support, dealing with the IRA/Profit Sharing plans and uninsured health costs for purported assault, together with collection of unpaid alimony based on 35% of bonuses and wages in excess of $156,000 have already been settled in this Chapter 13 case. Indeed, Jacqueline has been granted relief from the stay to pursue the alleged medical expenses arising from the purported assault and to give Jacqueline a second bite of the

apple would be tantamount to pure harassment. In addition, the confirmed Chapter 13 plan will provide specifically for the payment of the $4,500 per month alimony payment and no further litigation should be continued to attempt to collect that sum, which is being paid monthly in full. Thus, no good cause exists to allow modification of property rights already set by the California court after days of trial running from September 14, 1998, to September 29, 1998, Exhibit "A". The Debtor has been charged with $10,000.00 for Jacqueline's attorney's fees and has included that sum as a priority claim in the Chapter 13 plan. To allow further continuation of the property settlement dispute would be a waste of the Debtor's scarce resources and cannot, under these circumstances, be allowed. Therefore, the motion for relief from the stay to allow modification of the Divorce Decree is denied.

As for the appeal, Jacqueline concedes that it is within the sound discretion of this Bankruptcy Court to determine whether to grant relief from the automatic stay to allow litigation to continue, citing *Murray Indus., Inc. v. Aristech Chem. Corp. (In re Murray Indus., Inc.)*, 121 B.R. 635 (Bankr.M.D.Fla.1990), and *Piombo Corp. v. Castlerock Properties (In re Castlerock Properties)*, 781 F.2d 159 (9th Cir.1986). By way of background, in reviewing the Divorce Decree, which spreads over nine pages plus two exhibits, and contains 52 paragraphs of findings, entered after fifteen days of trial with trial briefs and oral argument, it is difficult to conceive that such Decree does not cover completely all of the issues presented to the family court. The findings are extensive, covering everything from a zebra skin rug with mane and tail to Orvis luggage and bar stools, with the wife charged with having received $19,760 from the checking account. Contempt citations were dismissed with prejudice. It noted that Debtor is ordered to maintain at a minimum a life insurance policy with death benefits of $1,000,000 with the wife as exclusive irrevocable beneficiary. And the court further found the wife did not work during the marriage to allow her to be self-supporting, thus fixing substantial alimony for a single person at $4,500. Also, Debtor is obligated to pay the wife's attorney's fees of $10,000 at $500 per month. That claim has now been agreed to by Debtor and the wife's attorney for status as a priority claim in Debtor's Plan.

Jacqueline's brief does not delineate the issues on appeal, only commenting that a dramatic redistribution of the parties' marital assets (including the IRA and profit sharing plan) under California law would a devastating effect which the Debtor would have to face after the bankruptcy was concluded. Whenever the appeal is decided and with what result is really not critical at this time. The Debtor's present financial circumstances, wherein the spousal award is paid from property of the estate, as well as Jacqueline's divorce counsel on a priority basis, and the collection efforts of the IRS brought to halt, together with the solemn fact that the Debtor simply cannot afford any further divorce litigation since such cost would clearly impair Debtor's ability to complete payments under the Chapter 13 Plan are clearly overriding and compelling circumstances to stay the appeal and halt further domestic litigation. The parties can live with the present Decree, and Jacqueline has not shown by any evidence why the appeal is so critical to her continued livelihood. It is noteworthy that the record is absent of any request by Jacqueline to the state court to stay the effect of the Divorce Decree during appeal, if indeed it is so onerous and without factual or legal basis.

In sum, on balance, to preserve the assets of Debtor's estate for the benefit of all creditors, including Jacqueline, the needless cost to continue the appeal must stop. The litigation can await completion of Debtor's Plan. One other factor must be remembered here. Jacqueline has already been granted relief from the stay to pursue her tort claim against Debtor, which claim includes at least one significant issue

Jacqueline raised in her modification request and dismissed as an issue appeal and that is the alleged future medical expense which Jacqueline pegs at $250,000. So she will have her day in court to fully satisfy all of her financial claims—if she is successful. But one court try is enough. Judicial economy and needless litigation expense simply dictates that Debtor must be free to bring his life into financial focus and satisfy his creditors through his Chapter 13 Plan. That overriding consideration demands the motion for relief of the automatic stay to rehash all the marital estate issues on appeal after they have been extensively tried and decided in the family trial court must be denied. It is clear that all of Jacqueline's actions to seek modification post-bankruptcy petition, continue the appeal, try the tort action, actively resist confirmation of the Chapter 13 Plan and seek two reliefs from the automatic stay is overkill and must be brought to a halt. Nothing else will satisfy the real purpose of a Chapter 13 case.

IT IS THEREFORE ORDERED:

A. Debtor's objection to Jacqueline Allen's Proof of Claim No. 6 is sustained and said claim is allowed as a general unsecured claim; Debtor's objections to Jacqueline Allen's Proofs of Claim Nos. 7, 8, 9, 10 and 12 are sustained; and Proof of Claim Nos. 7, 8, 9, 10 and 12 are disallowed.

B. The Court shall issue a separate Order confirming Debtor's First Amended Chapter 13 plan; and

C. Jacqueline Allen's second motion for relief from the automatic stay is denied.